## DE LUCA v. SHEPARD S. S. CO., Inc.
### No. 371.

Circuit Court of Appeals, Second Circuit.
May 29, 1933.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal and Francis J. Fitzpatrick, both of New York City, of counsel), for appellant.

Harry S. Austin, of New York City, for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

When the accident happened, the Wind Rush, with a load of lumber, was lying bow in with her starboard side to Pier 65, Brooklyn. A lighter, also bow in, was at her port side receiving drafts of lumber which were raised from the ship by what is called an up and down winch to a position where they could be lowered to the deck of the lighter by slacking off both winches at the same time. The booms of these winches were stationary. The boom of the up and down winch was fixed in position to permit the drafts of lumber to be raised straight up from the ship,

while that of the burton winch was over the deck of the lighter to permit hauling the draft over to a point from which, when the falls on both winches were played off by letting the weight of a draft unwind both drums, the lumber would descend to the desired place on the lighter. Two winches worked together to accomplish what one, with a moveable boom and room for operation, could presumably have done alone.

The plaintiff's intestate, Giovani De Luca, was the boss at No. 2 hatch in charge of the unloading there for the stevedore. There were two king-posts between No. 2 hatch and No. 1 hatch, to each of which one of the booms already mentioned was attached. The lumber was stowed over the winches in such a way that the drums on which the falls wound and unwound during the unloading could not be seen by the winchmen or by any one else unless an observer was put in a narrow space expressly to watch them.

The winchman operated the winches by means of sticks extending down through small spaces, left for that purpose when the lumber was stowed, and attached to the levers that actuated the winches.

The fall on the up and down winch was a wire cable having a rope core. It was dry on the outside and there was some evidence that the grease with which the core should have been saturated had been squeezed out by use. However that may be, the evidence establishes the fact that such a fall should be greased and not dry, as it was liable to become kinked in slacking off if unwound too much after the fall had stopped running out away from the drum, as it might when a draft had settled upon the lighter's deck. This danger of kinking was not eliminated by the presence of grease on the fall, but was lessened, and, if a kink did occur, it would the more readily be pulled out by the weight of the load and so be less likely to have serious consequences, for the grease would tend to let the winds of the fall on the drum slip out of the kink by decreasing the tendency of the fall to bind on itself. The manner in which the lumber was stowed, the covering of the winch drums so that they could not be seen, and the dryness of the fall on the up and down winch, were all plainly to be seen, and must have been known to the plaintiff's intestate.

At about half past 3 in the afternoon on September 11, 1931, De Luca was on the deck of the lighter superintending the placing of the drafts of lumber as they came from the ship. The work had been going on since about 9:30 that morning. A draft came over and was lowered to the deck, but the fall on the up and down winch was not slack enough to allow the hook to be detached. A signal to the winchman was relayed to him in the customary way by a gangwayman, and he pushed the stick attached to the winch lever in the normal direction to slack off further. This time the reverse of the expected happened. The fall became taut and pulled the draft over toward De Luca. He was caught and killed by being crushed between it and lumber stowed on the lighter. It was discovered upon investigation that, when some previous draft had been lowered, a kink had formed in the fall on the drum which reversed the winding just at this point and pulled the draft over against De Luca instead of letting the fall sag down to permit unhooking. There was, to be sure, testimony that the kink was found, after the fall had been wound on the drum just after the accident, under too many turns to have taken effect at the point necessary to reverse the action of the winch to pull the draft against De Luca. The witness so testifying must have been mistaken in his estimate of the length of the fall unwound to reach the kink, for the action of the winch was undoubtedly reversed at the crucial point. The only thing, aside from a kink in the fall at that place on the drum, which could have brought about the result, would have been a movement of the lever by the winchman contrary to the order he was given to slack away. There is no claim that he moved the lever in the wrong direction, and, on the contrary, the evidence is uncontradicted that when the fall was wound up after the accident the lever was moved as it normally would have been to unwind the fall. It is probable, though not proved, that this kink is what prevented the fall running out, without the reversing order to the winchman, sufficiently to permit unhooking this draft.

The only points raised on this appeal may be considered together, as they are based on the denial of a motion to dismiss the complaint made when the plaintiff rested and renewed at the close of all the evidence; and on the refusal to grant a motion to direct a verdict for the defendant.

The winches and falls were furnished by the defendant for the use of the stevedoring company and its employees. It was the duty of the defendant to furnish appliances, if it furnished any, which were suitable for the work and free from defects. The No. 34 (C. C. A.) 25 F.(2d) 602; Fauntleroy v. Argonaut S.S. Line, Inc., 27 F.(2d) 50; Steel

v. McNeil (C. C. A.) 60 F. 105. This, of course, required the defendant to provide a fall that was in reasonably good condition. It was likewise its duty to provide the employees of the stevedore with a place in which it was reasonably safe to work. Grays Harbor Stevedore Co. v. Fountain, 5 F.(2d) 385; Drowne v. Great Lakes Transit Corporation, 5 F.(2d) 58. We believe the evidence was sufficient to warrant a finding by the jury that the fall furnished was too dry to be suitable for the use to which it was put, especially since it was to be used on a drum so covered with lumber that, if a kink did form, the winchman could not see it. The stowage of the lumber, relied on as a negligent cause of De Luca's death, played its part in its effect upon the furnishing of the dry fall for use with a drum made invisible to the winchman by the way the lumber was stowed; yet upon the facts in this case it is enough to say that the jury was justified in finding the defendant negligent in providing such a fall to unload the lumber so stowed without deciding whether the stowage alone, had a well-greased fall been furnished, would have been any breach of duty toward this plaintiff.

But to enable the plaintiff to recover it must appear that the defendant was guilty of negligence which is actionable. It is upon this phase of the case that the knowledge De Luca had of the condition of the fall, the stowage of the lumber, and the consequent inability of the winchman or anybody else to see when a kink formed becomes vital.

All these things were plain to be seen, and De Luca was the man in charge of the work. It was his duty to know about all of them; and in law he is charged with the effect of the knowledge he must have acquired when he saw how the lumber was stowed and saw that the fall was dry. He was not a seaman, but the employee of an independent contractor. He was free to refuse to use the fall on a hidden drum, and so assumed the risk both of using appliances furnished by the defendant which were patently defective and the risk created by conditions aboard the ship which were known to him to exist. Long v. Silver Line (C. C. A.) 48 F.(2d) 15; The Hindustan (D. C.) 37 F.(2d) 932, affirmed (C. C. A.) 44 F.(2d) 1015. Having accepted conditions as they were, knowing what they were, the added danger from the increased likelihood that kinks would form because the fall was dry and be undetected because the drum was known to him to be out of sight were inherent in the work, and it became De Luca's duty as the man in charge to use such added precautions in operation as prudence required. His failure to do so by having a man stationed to give warning when a kink formed was the proximate cause of his death, and the motion for a directed verdict should have been granted.

Judgment reversed.