## DE LUCA v. SHEPARD S. S. CO., Inc.
### No. 371.

Circuit Court of Appeal, Second Circuit.
Nov. 13, 1933.

438

Harry S. Austin, of New York City, for plaintiff-appellee.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal and Francis J. Fitzpatrick, both of New York City, of counsel), for defendant-appellant.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Further consideration of this case has convinced us that there was not, as stated in the original opinion [see (C. C. A.) 65 F. (2d) 566], sufficient evidence to take the case to the jury on the question of defendant's negligence in furnishing a cable too dry to be fit for the use to which it was to be put; and that the evidence did not present a situation for the application of the doctrine of assumption of risk as to any known and appreciated danger caused by the known negligence of the defendant in that respect. Therefore that part of the original opinion which relates to the negligence of the defendant in furnishing a dry cable and the assumption by the plaintiff's intestate of the risk thereby created is withdrawn.

■ There was no defect in the cable furnished by the defendant unless its dryness made it defective. Its dryness, however, had no effect other than to make kinks more likely to form than if the core of the cable had been as well saturated with grease as when new. Even when new such a cable would kink in use. The danger from kinks lay, not in their formation, but in the use of the cable after they had formed and without removing them. They were formed when, after too much slack had been allowed to run out, the rewinding of the drum did not result, as it should, in parallel windings in each course, but with at least one turn caught over another to bind the cable at the place of the kink, so far as later unwinding was concerned, to the same effect as though the end of the cable attached to the drum had been reached. This did not reverse the action of the cable at the time the kink formed. The reversal of the cable action and the danger from that came only after a kink had formed and when a subsequent draft of lumber was being lowered because, as when this accident happened, the kink would stop further playing out of the cable at the kink and, if the drum continued its unwinding movement under power, cause it to wind up in the opposite direction on the drum to pull the draft up instead of to let it down. Granted all this, the evidence in its aspect most favorable to the plaintiff does no more than show that this cable, like any cable in such use, needed to be watched in operation for kinks on the drum. As all such cables kinked when too much slack was allowed, it is obvious that this inherent danger required suitable precaution to detect and take out the kinks whenever they did form whether the cable was dry or not. This meant no more and no less so far as care and safety were concerned in using this cable than observation adequate to give knowledge of what was happening on the drum. Precaution sufficient to detect a kink which might have formed in any cable so used would as readily have made known the presence of a kink which formed in this one. It could then have been removed before further use just as if the cable were not dry. That more kinks might have formed because this cable was dry meant nothing but added delay in the work and inconvenience in taking them out. Consequently no negligence was proved against the defendant in furnishing this cable, which was as safe as any if properly used. The fact that the winchman could not see the drum was known. The way the lumber was stowed, moreover, did not obscure the drum to any greater extent when this cable was used on it than it would had a well-greased cable been used. A man stationed to watch it until the lumber was removed sufficiently to expose the drum to the winchman, who could then do that himself, was all that was required; and that was plainly essential to safety whether the cable used was greasy or dry. Lack of grease lessened the utility of the cable perhaps, since more time might be lost in taking out kinks, but did not make it unsafe to use. Had the winch been adequately manned in view of the fact that the winchman himself could not see the drum, and it was no part of the defendant's duty to do that, the kink would have been seen and taken out before it could have reversed the winding.

■ The deceased was a man of over twenty years' experience as hatch boss in charge of this kind of work in which winches were used. Of all men, he must have known that kinks were likely to form and what their effect would be if the work was continued without their removal. The defendant was under no duty to tell him how to perform his work for his own employer. It was his duty as the man in charge of the work at this hatch to

use the care a prudent man would exercise in working a winch with a drum out of the sight of the winchman and the defendant had the right to assume that he would exercise that degree of care in using the cable it furnished. As his failure to do that, rather than any negligence of the defendant in providing the cable, was the cause of his death, we feel bound to adhere to the result reached after the original argument.