## PUGLIESE v. PANAMA TRANSPORT CO.

District Court, S. D. New York.

Aug. 16, 1944.

Benjamin Green, of New York City (Jacob Rassner, of New York City, of counsel), for libellant.

E. C. Sherwood, of New York City, for petitioner Travelers Ins. Co.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Walter X. Connor, of New York City, of counsel), for respondent.

CONGER, District Judge.

Action in admiralty for damages for personal injuries suffered by Libellant on March 16, 1942.

Libellant at the time of his injuries was employed as a stevedore by Imperato Stevedoring Company.

On that date the said Stevedoring Company was loading cargo on the S.S. "C. O. Stillman." The cargo was being unloaded from a lighter which was alongside the vessel. The operation was being done by a swing boom which was controlled by two steam winches. One winch caused the boom to swing outward to the lighter. The draft was then attached to a hook at the end of a wire cable attached to the boom. It was then raised by the second winch and swung inboard by the first winch over the spot where it was to be placed on the vessel. Then the draft was lowered by the second winch. We are solely concerned with this winch. It has been called the up and down winch. It only had to do with the lowering and raising of the draft.

On the day in question Libellant with other fellow employees of Imperato had been engaged in handling the drafts as they came on the vessel. At the time of the accident Libellant had been working on some pipes which had previously been put on the deck of the steamship. A draft consisting of several cases, and weighing about 400 to 500 pounds, was coming inboard by the means which I have hereinbefore described. As the draft came inboard, about 2 or 3 feet above the deck, Libellant stepped out of the way so that it passed him about 2 feet away. Libellant then went back to work on the pipes. There is testimony that the draft swung inboard and then started to swing back and as it swung back it struck Libellant and knocked him overboard. He fell to the deck of the lighter 25 to 30 feet below. Libellant's story is that when he returned to work after the draft passed him on its way inboard he no longer paid attention to the draft but that in a very short time thereafter the draft struck him.

The claim of Libellant is that when the draft started to swing outboard he was in its path and one Vindigni seeing the draft about 5 or 6 feet away from Libellant gave a signal to the man operating the winch to lower the draft and that the winchman (Scotto) attempted to do so but could not pull the lever of the winch to do

so because it stuck. As a result the draft continued on and struck Libellant.

Vindigni's job was to signal the winchman. The draft was lowered or raised in accordance with the signals given by Vindigni. Scotto was operating the winch in question and he did so in accordance with the signals he got from Vindigni. Both Scotto and Vindigni were fellow employees of Libellant, all in the employ of the Stevedoring Company. As far as the testimony shows, none of the ship's personnel had anything to do with the operations. Respondent was the owner of the steamship and the owner of the winch which was being operated by Scotto.

The issue here is very narrow. There is only one issue. Libellant's claim is that the winch was defective, and that the proximate cause of the accident was this defective winch. Of course, if the winchman (Scotto) was negligent and his negligence was the proximate cause of the accident Libellant may not recover.

The winch was furnished by Respondent for the use of the Stevedoring Company and its employees. It was the duty of Respondent to furnish an appliance, if it furnished any, that was suitable for the work and free from defects. DeLuca v. Shepard S.S., 2 Cir., 65 F.2d 566.

Libellant's whole case on the question of negligence is predicated upon the testimony of Scotto (the winchman) and Vindigni (the signal man). Libellant himself was not in a position to give any testimony on this aspect of the case, except that he was doing his work when struck by the draft.

Libellant's whole case on the issue of negligence may be summed up in a few words; that the draft came over and started to swing back and that when the draft was 5 or 6 feet from Pugliese, Vindigni saw and appreciated the danger and signalled and directed Scotto to lower the draft; that there was ample time to do so before the draft would reach Pugliese; that Scotto tried to lower the draft but the winch lever stuck; that he tried to pull it but it would not move; that there was no way he could prevent the draft from striking Libellant with the lever fast; that the lever was in a hoist position; that in order to lower the draft Scotto had to pull the lever toward him but it would not move despite all his effort; there is testimony on the part of Scotto and Vindigni

that the winch had not been working properly; that the lever worked hard; not on every draft but 3 or 4 times an hour it would stick so that it could not be moved; that complaint had been made to some one on the ship that the winch was not working properly.

In its defense Respondent produced as its witness, Joseph Imperato, one of the proprietors of Imperato Stevedoring Company, who testified that he was on board the day of the accident; that he was supervising the work; that he saw the accident; that as the draft came over the ship it was spinning around as it hung there over the deck; that it touched Libellant, who fell in the pipe; that Libellant tried to hold on but fell overboard; that no complaint was ever made to him that the winch was not working properly.

Benjamin Imperato (foreman for Imperato Stevedoring Company) testified that he did not see the accident; that no one complained to him about the winches or how they were working. Moore, 1st Assistant Engineer and Banson, Chief Officer of the Stillman testified as to the condition of the winches. Both testified that no complaint had been made to them about this winch. They testified rather generally that the winch was in good condition. Banson testified that after the accident he inspected all the ship's gear, booms, guys, winches, etc., and saw nothing wrong; that he watched the loading of cargo for half an hour and found nothing wrong. There was testimony from one or both of them that no repairs were made to the winch.

Robert Haigh, an engineer expert, testified and explained how the winch worked. It will not be necessary to refer to his testimony.

On the whole case I can't say that the Libellant has met the burden which the law imposes on him, to prove that issue of negligence by a preponderance of the credible testimony.

I can't give full faith and credit to the testimony of Scotto and Vindigni.

Shortly after the accident a man (Doherty) representing one of the interested parties came on board and talked with Scotto and produced in court a paper signed by Scotto (Ex.A). In this paper there is this statement, "I have been working on this winch all day and it is in perfect working order and it has been working properly." Scotto said he had signed this paper; that

he could neither speak, write or read English (he has been in this country since 1907, is a citizen and has voted); that he did not know what was in the paper; that he did tell this man that the winch was *no* good. In all this Scotto was directly contradicted by Doherty who took the statement and by Joseph Imperato. Both testified that Doherty asked Scotto about the accident and Imperato interpreted for him; that Doherty read the paper and Imperato interpreted it for Scotto who then signed the paper; both of these men testified that Scotto was asked if there was anything wrong with the winch and that he said, "No." This is a contradiction on the most important element in the case. As a matter of fact, Scotto is the only witness who testified from knowledge that the lever on the winch was stiff.

Some time during the early part of June, 1943, both Scotto and Vindigni were interviewed on separate days at the office of the attorneys for Respondent. In each instance, the statement took the form of questions and answers. Stenographers took the statements. The questioning was done through interpretation. Libellant's attorney stipulated in Court that the transcripts were accurate. Scotto in this statement (Ex. B) not once but at least three times stated that the signal given him was to *raise* the draft not lower it; that in attempting to raise the draft the winch did not work. I quote from his statement.

"Q. The question I asked you was whether or not before this accident you raised the draft to the level of the rail of the ship and then stopped? A. Yes.

"Q. Did you then wait for the men to take hold of the draft? A. After the draft had been raised to the level of the rail the men were waiting, ready to handle the draft.

"Q. Was the draft swinging at all that time? A. When the draft was taken up above the rail and the men were standing by to take the draft it was not swinging at that particular time.

"Q. What was the next signal given by the gangwayman? A. The gangwayman told me to take it up a little.

"Q. Did you do that? A. I tried to take it up but the winch wouldn't function.

"Q. What happened? Didn't the drum move? A. I opened the steam to raise the draft but the draft didn't move; in other words, didn't come up.

"Q. Then what happened? A. That is when the man was knocked over.

"Q. In order to operate this winch did you open the valve to let steam into the cylinders? A. It had a lever on it.

"Q. When you push it down it goes one way; when you pull it it goes the other way? A. I am not sure now whether there was a lever or whether it was a wheel on a valve."

Vindigni at the trial testified that he gave Scotto a signal to lower the draft in order to save Libellant from being hit with the draft. In his statement taken on June 3 (Ex.D) several times he stated that the signal he gave was to *raise* the draft not to *lower* it. He further stated he gave a warning to Pugliese to "watch" "the draft is coming." At the trial he testified the only signal he gave was "arrea" or "ria" (lower).

True, on a later date (February 3, 1944) both Scotto and Vindigni at another interview at the office of Respondent's attorney apparently retracted and made a statement which conforms to their testimony at the trial.

In view of these contradictory statements as to the real issue of negligence by these two witnesses, I can't give full faith and credit to their testimony at the trial. In order for Libellant to succeed here I must believe the story told by these two witnesses. They have not convinced me.

On the whole case I can't say that Libellant has made out a case by a preponderance of credible testimony that this winch was defective, and that this defect of the winch was the proximate cause of the accident which caused the injuries to Libellant.

Judgment for respondent. Complaint is dismissed with costs.

Settle decree on 5 days' notice.