IVUSICH v. CUNARD WHITE STAR, LIMITED.

District Court, S. D. New York.

May 10, 1945.

Jacob Rassner, of New York City, for plaintiff.

Reid, Cunningham & Freehill, of New York City (Frederick H. Cunningham, of New York City, of counsel), for defendant.

BRIGHT, District Judge.

The only negligence upon which libellant can base his claim to a recovery is that respondent furnished for use by his fellow winchman, a steam winch which worked stiffly, if that is negligence. He was a member of a group of stevedores, all employees of the Jarka Corporation, to which had been delegated by the respondent the duty of loading cargo on the Steam Ship Empire Spray, owned and operated by the respondent.

In doing the work, these men were furnished by the respondent with two winches situated aft of No. 4 hold, into which the cargo was being loaded. That cargo consisted of cylindrical pieces of steel, 8 to 10 feet in length, and 4 to 6 inches in diameter. The cargo was hoisted from a lighter over the ship's side into the hold. Both winches were used in the operation. One of them was called the up and down

winch, and was operated by plaintiff's fellow employee Amato; the other, called the burton switch, was operated by McCarthy, another fellow employee and since deceased. This gang of longshoremen, not including libellant, who did not come to work until 1 o'clock, had started work in the hold in question at 8 o'clock in the morning of September 9, 1941, the date of the accident. Their first job was to take off the hatch covers and clean out the dirt and rubbish in that hold, and that was completed in about two hours. From then on from three to three and one-half hours they had stowed between twenty and twenty-five drafts of the steel which had been placed on the floor of the hatch, forming what they called a table. In this work both winches were used jointly and simultaneously. No difficulty had been experienced in their use prior to the accident, except that sufficient steam had not been furnished by the respondent earlier in the day, but that had been remedied, and except that the lever on the up and down winch worked stiffly. So far as appears, however, that stiffness had not interfered in any way with the conduct of the work, or caused any trouble.

The draft of steel which caused the injury to libellant had been lowered into the hold just prior to the accident, and rested upon the table of steel already placed. The other longshoremen in the hold, under the direction of their boss, were to place dunnage or planks over the table, and by means of rollers were to move the draft into place in the wing of the ship. After this dunnage had been placed, the foreman ordered libellant and three other of his fellow workmen to station themselves two on each side and end of the draft to control the movement of the draft when suspended.

Through the center of the ship ran what has been called the tunnel, which covered the shaft operating the propeller. The tunnel was about 4 feet high and libellant was directed to take his customary position between the draft and the tunnel, which he did. The draft was raised by the winchman about 1½ feet or 2 feet, above the table of steel, the signal for that being first given by the boss, who was with the men in the hold, to the gangwaymen standing on the deck about 35 feet above and looking down into the hold, and was communicated by him by hand to the winchmen who were supposed to operate the winches together in unison. When so suspended, there was a space of 3 to 4 feet between the draft and the tunnel and libellant stood in one end of that space.

The order was then given by the boss in the hold to lower the draft upon the rollers placed by libellant and his fellow workers. The burton winch responded, and the up and down winch failed to do so. Thus the control of the draft by the burton winch was lost. The entire weight of it was shifted to the wire from the up and down winch, causing the draft to swing rapidly over, pinning the libellant against the tunnel before he could get out of the way, and causing him severe and permanent injuries to both legs.

The only one who actually knew what happened at the winch was Amato, the up and down winchman. Absent any defect in the winch, he was the one solely responsible for libellant's injury if he did not respond promptly and carefully to the signal of the gangwayman to lower the draft, and for his negligence alone there could be no recovery. He had been an experienced winchman for many years. He had also operated that winch that day from 8 o'clock in the morning until 2:30 or 3 o'clock in the afternoon, when the accident happened. No trouble had resulted when the 20 or 25 other drafts of steel had been lowered into the hold. In the operation of the winch, he used his right hand to control the steam, which furnished the power, and his left to control the lever, which raised or lowered the draft. He testified that before the accident, they landed the draft in the bottom of the ship, that both winches had to work together, the draft could not be landed otherwise, and both did work together. He and the other winchmen waited a few minutes, were then signalled by the gangwaymen to go ahead, both winches went together and they lifted the draft a foot and a half or a little more, and stopped. Then they got another signal by hand for the two of them to let go, the burton winch let go, the up and down winch did not; Amato's left hand was on the lever and his right on the steam; he shut off the steam and tried to bring the lever back but could not get it back because it was sort of stiff, he could not move it; he did all that he could with one arm and could not pull it back at the time. Then he got another signal to stop. The other wire on the burton switch was then used to pull the draft clear of the tunnel, and then the two of them had to let go.

Amato shut off his steam altogether, put both hands on the lever, and had a job to bring it back, but did so after he had completely shut off the steam. He further testified that when the steam is on it makes the pulling of the lever more difficult, but you have to have the steam on to hold the draft when it is suspended above the floor.

He further testified that he had complained at about 2 o'clock that day, to a representative of the defendant, that the winch was not working properly; that he got hold of the lever and showed him that he could not bring it back with one hand, that he could bring it back with two, but he could not do that because he had to have one hand on the steam. He said that the ship's representative stated that they would repair it, would see what they could do about it, but did not tell him to stop using it. He had also complained to the man who went around the ship greasing the winches, tightening the nuts, etc., who put oil on it and did his best but it did not help.

This testimony in many respects was at variance with a statement which Amato had given to his employer two days after the accident. In that statement, he said that the winches had been unable to raise more than one bundle of steel during the morning because of the failure to get enough steam; that after the matter was called to the attention of their gang foreman and the representative of the ship, they got plenty of steam; and at about 2 o'clock they commenced taking in two bundles at a time, and from then on had plenty of steam. He does not say in the statement that he complained about the reversing lever working stiffly; but he does say that he noticed all day that it did so work, and that one of his fellow employees put oil over his winch and oiled the release lever, but he did not remember whether this was before or after libellant was hurt. He further said: "When the accident happened we had lots of steam. We were lowering in a 2-bundle draft. I know that we landed it on the offshore or starboard side of the hatch. I could not see down into the hatch from where I was sitting, so I don't know the exact spot where we landed the draft. Then in a few seconds the gangwayman, William Fortune, gave the signal to 'go ahead', or raise the draft. However just as soon as he gave me that signal he immediately gave me the signal to 'come back' or lower the draft. This signal was all given in a single motion of the hand, in other words, there was no break between the two signals. I distinctly remember that these 2 signals were only given to me because the signalman (gangwayman) only used his right hand at the time. He did not use his left hand at all. In response to the two quick signals I could not very well come back that fast. As I said above, the lever was quite stiff and that stiffness may have made me a little slower than usual, but I do know that even on the best winch I ever drove the odds are against it and it is very hard to do. So it took a little time to shut off my steam lever (valve) and reverse the big handle (the reversing lever). While I was trying to do this, (and it only took about 3 seconds) I heard someone holler in the hatch and I knew someone was hurt. Then we dropped the draft there and took the man out of the hatch. After the man was taken away we went back to work. The winch worked O. K. and continued to work O. K. except that the handle was still stiff."

There is no dispute in the testimony that this ship was a new one and that winches on new ships usually work more or less stiffly. There is no contradiction in the evidence that the lever on the up and down winch did work stiffly. The question then is whether or not that was a defect, or evidence of the want of reasonable care on the part of the respondent. The respondent was not bound to the highest degree of care, nor to furnish the best appliance. It was bound to exercise reasonable care to make sure that when it furnished an appliance it was in safe condition for the use to which it was to be put by the stevedores. Grosso v. Lorentzen, 2 Cir., 149 F.2d 127.

The written statement of Amato seriously affects his credibility. Given, as it was, to his employer, and within two days after the accident, it states, in my judgment, the actual manner in which the accident occurred. It does not bear out libellant's contention.

But, assuming that the lever did work stiffly, and because thereof the two winches may not have operated simultaneously, I cannot find negligence, or that the up and down winch was defective and not reasonably safe, or that the ship was unseaworthy. The winch was used before and after the accident without event or trouble.

It did not interfere with the work, or cause the men working with and around it to anticipate danger or accident. I cannot, and do not, find that there was any negligence or unseaworthiness. Pugliese v. Panama Transport Co., D.C., 65 F.Supp. 433, 1944.

I see nothing in respondent's contention that the acceptance by libellant of compensation payments was any defense. Grosso v. Lorentzen, supra.

The libel is dismissed. Findings may be proposed by respondent, which will serve a copy on libellant's attorney within ten days from this date, and who may have five days in which to make objections.