## ONDATO v. STANDARD OIL CO.

Civ. No. 10089.

United States District Court
E. D. New York.

April 25, 1951.

Philip Di Costanzo, Brooklyn, N. Y. (Robert Klonsky, New York City, of counsel), for plaintiff.

Kirlin, Campbell & Keating, New York City (Walter X. Connor and Matthew L. Danahar, New York City, of counsel), for defendant.

BYERS, District Judge.

This is a motion by defendant under Fed.Rules Civ.Proc. rule 50(b), 28 U.S. C.A., for judgment in its favor pursuant to its motion for directed verdict as to which decision was reserved on April 3, 1951, when a mistrial was ordered following the inability of the jury to agree upon the answer to two of three questions submitted by the Court on the issue of liability. It was deemed expedient to seek answers to those questions before taking medical testimony concerning the nature and extent of the plaintiff's injuries.

The plaintiff was in the employ of Imparato Stevedore Company which conducted the discharge of the cargo of defendant's S. S. Esso Aruba on July 6, 1947, at Pier 4, Bayonne, N. J. This required the hoisting of laden canvas slings from the ship at hatch #1, and the lowering thereof to a barge alongside, and the return of the empty sling to the ship's deck for refill below. It was the latter operation with which the cause is concerned, not the raising of the laden sling from the ship's hold, which employed gear not presently involved.

The hoisting of the empty sling from the barge required the operation of a Burton winch in connection with a boom which projected over the ship's side so as to permit the run of a fall rigged on that boom, whereby the laden sling was lowered, and the empty sling was raised. That winch is one involved in this case.

The complaint alleges in effect that this winch was defective; an unopposed amendment at the outset of the trial was granted in which it was alleged that: "in particular a certain Burton winch at the No. 1 hatch, which was in an unseaworthy condition as understood within the Sieracki doctrine". It was agreed that the amended pleading alleged that the defect was patent and discoverable by inspection.

The plaintiff was injured as the result of the glove on his left hand being caught on the hook from which an empty sling was hanging, at a distance of a few feet above the 3½ foot bulwark, as the sling was still moving upwards. He at once

called out to the winchman, and that was the first knowledge of the latter, that the plaintiff was in peril. Thus on direct (p. 15): "What did you see right after that point?" (After the sling went down to the barge.)

He answered: "I saw that man yelling, yelling that the hook had got him, and when I saw this danger I tried to lower the lever (of the winch), and it was too hard, and I could not stop it quickly, and before I could stop I had raised him about six feet or seven feet * * *."

While still giving his direct testimony but following the luncheon recess, the following occurred (p. 34):

"Q. Did you see the sling do anything to him? A. No.

"Q. Did you see a hook do anything to him? A. I saw the hook catch his glove.

"Q. You did see that, didn't you? A. Yes, sure.

"Q. And then what happened after that? A. And then I tried to stop the winch, but I could not.

"Q. And when the hook caught his glove was he then standing on the deck? A. Yes.

"Q. And how much further up did this winch (sic) go before he dropped it? A. About six feet. Almost six feet. Six feet from the bulwark."

The difference between these two versions is quite significant. If the winchman's attention was first attracted by the plaintiff's calling out to him according to the earlier testimony, he could not have seen the hook catch the glove since that had already occurred.

Probably the difference in time was a matter of an instant or two and therefore unimportant. But whether the winchman was watching the plaintiff just prior to the engagement of the hook is of great consequence, because if he was not, the lapse of time during which the plaintiff was carried upward is to be accounted for in part by the winchman's not trying to shut down the lever until he realized the necessity for arresting the plaintiff's ascent.

It should be explained that the manner of conducting the lifting operation of the empty sling was for the plaintiff to give the hoisting signal after observing the readiness of the sling for that movement; when it had arrived at about the level of the bulwark (agreed to be 3½ feet high) so that the latter could bear the weight of the empty sling when being hauled inboard, the hook of course, being above the sling, would appear first. When the hook came into sight the winchman customarily stopped the upward movement (p. 55), apparently without signal from the plaintiff.

This was accomplished by pushing down on the lever of the winch, in response to which the entire draft would come to a stop, to enable the plaintiff to haul the sling inboard; then the winch would move the draft down, for release of the hook. Since the distance between the hook in the bight of the rope holding the sling, to the bottom of the empty canvas bag was about 5 to 6 feet, that would be about the distance that the hook customarily moved upward from the time the winchman started to move the lever of the winch down, until the draft came to rest. Thus the timing of that operation called for judgment and skill on the part of the winchman and can be expressed in distance rather than in seconds. Since it was the duty of the winchman to operate the lever by grasping it, he must have looked at it, rather than at the hook on this occasion as soon as the latter reached about the level of the bulwark; from which it appears that his earlier testimony, that his first knowledge of the plaintiff's peril came from hearing the latter's cry, is the more probable than his later version that he indeed saw the hook engage the plaintiff's glove, unless this time he was operating the winch without looking at it.

If the testimony has been correctly analyzed, one of two things happened: (a) The winchman did not begin to stop the upward movement of the draft by pushing down on the lever of the winch when the hook was about at the level of the top of the bulwark, or (b) he did so in the usual way, and did not see the hook catch in the plaintiff's glove, but heard the latter's

outcry. If the latter was what took place, the hook was arrested in its upward movement in the customary way, but the plaintiff swung outboard none-the-less, because the winch was not moved down to enable the hook to be released from the sling.

A delay in starting that downward movement of the winch, even a very brief one, would account for the plaintiff's not falling to the deck of the ship when his glove was ripped apart.

In either case, it was faulty manipulation of the winch that caused the plaintiff to fall as he did, not a patent defect in the winch itself.

The plaintiff was hanging by his glove which gave way, and he was dropped some 15 or 20 feet (p. 188) to the deck of the lighter, which means that he must have swung outboard in his raised position (although he had been working on the deck of the ship), since the position of this boom, which has been stated, so ordained.

If he had not been raised by the upward travel of the hook sufficiently to fall overside when his glove ripped open, when that did happen he would have fallen to the deck of the ship.

Thus the issue was clearly presented of whether the winch was defective in a patent sense which was discoverable by inspection, so as to prevent the winchman's effort to arrest the upward movement soon enough to insure the plaintiff's falling inboard instead of outboard, for obviously no alleged defect in the winch was responsible for the engagement of the glove in the hook, or the tearing apart of the glove when it was bearing the plaintiff's weight.

The defendant's motion to dismiss when both sides rested as to negligence and unseaworthiness was denied, and decision was reserved on the motion for a directed verdict, and the three following questions were submitted to the jury after having been approved as to form by both counsel:

1. "Did the plaintiff's injuries result from the failure of the winchman to operate the Burton winch properly?"

2. "Did the plaintiff's injuries result from some mechanical or structural defect in the winch, and if so what was the defect?"

3. "Was the plaintiff negligent in trying to grasp the hook from which the sling was hanging, instead of the canvas sling itself?"

The jury answered the third question in the negative, but were unable to agree as to the first and second.

Since there was no defect shown in the structure of the winch or any of the gear employed, but instead an assertion of stiffness in the operation of the former, no such structural fault was present as in the Sieracki case [Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L. Ed. 1099] upon which plaintiff relied in making his motion for leave to amend.

It becomes important therefore to consider what the plaintiff's evidence shows as to the operation of this winch on the day in question. Vindigni, the winchman, says he started at 8 A.M. on that day, a Sunday, and the accident happened about 10 o'clock, which means that this described activity had gone forward for about two hours, without apparent winch difficulty. The foregoing statement has not been made inadvisedly although the winchman's testimony is difficult to follow, and is inconsistent in many instances with respect to winch conditions on this morning, prior to the accident. He first said the winch worked hard because of concentration of steam in the cylinders which caused a lot of things to happen with reference to the lever (p. 22), "as you open the lever—as soon as you open the lever the winch runs fast and I can't correct it". He was then asked what else he saw before the accident and he said (p. 23): "Nothing."

He then said (p. 24) that an engineer came at from 9 to 9:30, who was tightening bolts in the piston of the winch; that he had no conversation with him; (p. 26) he was asked if the winch was better or worse after the engineer left and answered: "The machinist or the engineer did nothing to it. The trouble was with the lever. It was too hard." And later: "The engineer is coming for the shutting off of a little steam, because on the piston the steam is

coming out. Some time I can't see." (p. 27) The question was repeated and he answered again that after the engineer left the lever worked "always hard * * * the same as it was before".

Again after the luncheon recess he was asked on direct (p. 29) if he spoke to anybody with reference to the working of the winch, and he answered "No", and (p. 30) he was asked if he heard anybody speak to any officer of the ship about the winch, and he answered: "No, I did not hear anyone." He had already said (p. 25): "I don't know whether I told the hatch boss, 'Look, this winch is bad'."

The impression that I derived from this testimony, as it was given, was that it was imaginative, and did not proceed from any recollection whatever. The fact has not been overlooked that the witness was examined through an interpreter, also that he may well have had reason to seek to blame upon the winch that which should have been visited upon its operator.

The above quotations demonstrate first, that the witness attributed to the engineer an adjustment of the steam supply to the cylinder, although he did not claim that steam screened his view of the plaintiff; and second, no complaint by him concerning the alleged stiffness of the lever in operation. This testimony must be compared with the plaintiff's on the same general subject.

Vindigni further said (p. 37) that the work continued after the plaintiff's injury except for an interruption of about one-half an hour, and that the winch worked hard, but he deposed nothing to the effect that during the later period anything was required to be done to the winch by way of repair, or that he refused to continue his work as winchman because of the alleged stiffness in moving the lever.

As to the delayed stopping of the upward movement of the sling which he attributed to difficulty in moving the lever down after he knew of the plaintiff's peril, he said (p. 123) that, after the plaintiff fell, the upward movement of the hook continued for two feet. In all then the hook must have moved upward from 6 to 8 feet from the time that the winchman saw the plaintiff hanging by his glove, but there is no testimony from any source which would indicate how many feet of such travel under the existing conditions could be expected from the operation of a winch which was not "hard" in its lever control, given all other mechanical conditions such as the length of boom, and length of fall then being used, and the expectable lag between the forward and reverse revolutions of the drum.

Clearly such response could not have been instantaneous in any case, but there was not submitted for the guidance of court or jury any testimony even roughly approximating a standard to which this device could have been compared to demonstrate lack of reasonable care to provide for plaintiff a safe place to work.

It now becomes necessary to consider the plaintiff's own testimony for the sake of comparison with that of the winchman concerning the happening itself and alleged antecedent events.

The plaintiff explains quite clearly the routine followed this morning from 8 o'clock and for the ensuing two hours, generally in accord with the foregoing recital: That the winchman would stop the upward movement of the draft, usually when the hook had reached 2 or 3 feet above the bulwark; then (p. 198) plaintiff would get the sling from the bottom and pull it into the deck; sometimes he could not get it because it would go too high. "It wasn't working well." (p. 204) The hook had to be 6 or 7 feet above the deck for the sling to come over the top of the bulwark. (p. 205) Plaintiff would reach for the hook as the sling came up, then if the latter continued up he left the hook and grabbed the sling. The lowering of the hook for disengagement then followed, as has been explained.

As to this particular draft, the plaintiff clearly says that the hook did not stop at about the level of the bulwark, but he placed his hand near the hook, thus (p. 220): "I took my hand and placed it near the hook in order to get it, and I took it for granted, and waited for it to stop, and it didn't stop, and it went aloft."

"Q. You mean you thought it was going to stop? A. Yes, and it didn't stop.

"Q. But you didn't wait before grabbing the hook to see if it would stop? A. No. I knew that when it reached that level I would say 'Ho' and it would stop.

"Q. But you knew also that on other occasions the hook would sometimes go three or four feet above the bulwark before it stopped? (He had so testified.)

\* \* \* \* \* \*

"A. Yes. It happened once that the hook went up, but we told the mechanic \* \* \*. *After the mechanic came, then it stopped regularly."* (Italics supplied.)

To the same effect, see page 222.

The plaintiff's testimony as a whole, including the quoted part, establishes clearly that he missed his grab for the hook and thus caused the glove to be caught; that the sling was moving upward at the time, and that the winchman did not observe that condition until the plaintiff called to him, which accounts for the continued vertical movement for an instant or two, long enough for the hook to reach a height of about 8 feet above the deck.

The plaintiff, realizing the unfortunate effect of his own testimony as to his reach for a rising hook instead of waiting for the winchman to arrest that movement as he had been doing, improvised the attentions of the "mechanic" and the consequent satisfactory working of the winch, to justify his own election to take the risk which has been related.

The necessary effect of that testimony is to cancel out what the winchman had already said, as above recited, about the alleged attempted adjustment by the "engineer", and the asserted lack of resultant improvement. These two versions are mutually destructive and, in my considered judgment, attempt to describe something which never happened; they were fabricated to gloss over an incurable infirmity in the plaintiff's asserted cause of action.

It thus becomes clear that the plaintiff reached for a hook that was rising although it was the winchman's job to stop it, and that was what the plaintiff expected; too late he realized that the winch-man had failed to do his work properly, and in the effort to excuse that obvious lapse, tried to construct an explanation not needed, in the absence of an assertion by the winchman that he observed a rising hook before the plaintiff tried to grab it, and could not bring the winch to a timely stop.

The witness Capuano, who did not see the accident but was 10 feet away from where the plaintiff was working, sewing on canvas slings to make necessary repairs, said that during the morning he heard the winchman holler "the handle was heavy".

In view of what has been brought to light concerning the testimony of the plaintiff and the winchman, it will be understood why this contribution does not constitute evidence in support of plaintiff's cause.

The conclusion forces itself upon this Court that the case should have been dismissed for failure of proof, when the plaintiff rested, and if the testimony had then received the same study that has now been possible, appropriate action would have been taken.

No consideration on this motion has been given to the defendant's testimony, but it should be stated that nothing developed in the defendant's case to buttress the plaintiff's asserted cause—quite the contrary.

Manifestly the decision of this motion has not been simplified by reference to the cases cited in the opposing briefs, because of dissimilarity in the factual backgrounds. The nearest seems to be that of Ivusich v. Cunard White Star, D.C., 65 F.Supp. 412, which was a decision on the merits in a cause in the Admiralty, which this is not. The present holding is that the plaintiff's testimony does not present evidence from which the jury could infer negligence on the part of the defendant, for reasons which it has been the effort to state with an approach to clarity. There is nothing in this record to substantiate the assertion that the winch was patently defective, and the jury's failure to agree to an answer to the second question is not without significance in that connection; its failure to

agree to an answer to the first with respect to the failure of the winchman to operate this winch properly is also significant. These two failures, taken together, do not relieve the Court from its own responsibility to pass upon plaintiff's failure to adduce any testimony tending to support the pertinent allegation of the amended complaint.

The defendant's motion for direction of a verdict is granted, and a judgment of dismissal is directed with costs.

Settle order.