## ONDATO v. STANDARD OIL CO.
### No. 143, Docket 22892.

United States Court of Appeals
Second Circuit.

Argued Jan. 15, 1954.

Decided Feb. 4, 1954.

Robert Klonsky, New York City, Philip F. DiCostanza, Brooklyn, N. Y., for appellant.

Walter X. Connor, Kirlin Campbell & Keating, New York City, Matthew L. Danahar, New York City, of counsel, for appellee.

Before L. HAND, FRANK and HINCKS, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment, entered upon a directed verdict for the defendant, in an action for personal injuries against the defendant's vessel, "Esso Aruba," on which he was at work as a longshoreman at Bayonne, New Jersey. The case was tried to a jury who disagreed and were discharged, and the order was entered upon the defendant's motion made at the conclusion of the evidence, decision being reserved until the discharge. The 12th Article of the complaint alleged that the injuries were caused by the negligence of the defendant's employees, and also by its failure "to keep and maintain the said vessel in a good, safe and seaworthy condition." At the opening of the trial this second allegation was amplified by adding: "in particular a certain Burton winch at the No. 1 hatch which was in an unseaworthy condition as understood within the Sieracki doctrine," this defect being "patent and discoverable by inspection." We refer to Judge Byers' discussion of the facts in his opinion, reported in 97 F. Supp. 37; and in what we say we shall assume an acquaintance with the evidence as he there discloses it. The question is whether the plaintiff had so clearly failed to make out a case that he was justified in directing a verdict for the defendant.

In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, the Supreme Court extended the ship's liability for unseaworthiness to longshoremen working on board; and in Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, extended it still further so as to

cover a mechanic who had come on board to repair the ship in port. In these cases the liability is the same as that to seamen at sea, and is measured by the same test as when the damage is to cargo: i. e., whether in hull and gear she was reasonably fit for the purposes of her voyage;[1] and it is immaterial how much diligence may have been used, if it fails to make her so. The winchman, Vindigni, swore that the winch had been out of order during the morning of the accident: the lever was stiff, and would not move as it should, when he pushed on it; at times he had to use both hands and put his full weight upon it. If this was true, it was not fit for its purpose, for it should not have required so much force to move. The winchman had at once to watch the rise and fall of the slings, yet to be always ready immediately to control the winch. This he could not do, or at least could do only very awkwardly, if it required two hands and a substantial pressure to move the lever. It is true that in Ivusich v. Cunard White Star, D.C., 65 F.Supp. 412, 413, which we affirmed on Judge Bright's opinion, 2 Cir., 155 F.2d 104, the lever of the winch was also stiff; but the "stiffness had not interfered in any way with the conduct of the work, or caused any trouble." In the winchman's statement before trial, which Judge Bright accepted as the truth (the trial was not to a jury), he had said: "As I said above, the lever was quite stiff and that stiffness may have made me a little

slower than usual, but I do know that even on the best winch I ever drove the odds are against it (sic) and it is very hard to do." The ship was new and winches on new ships usually work more or less stiffly; the winch was used before and after the accident without causing trouble. In the case at bar if the jury was free to accept Vindigni's testimony, we do not see how it can be doubted that the winch was "unseaworthy" and that the defect was "patent and discoverable by inspection."

Whether the defect was a cause of the plaintiff's fall depended upon whether Vindigni saw that Ondato had been caught by the hook in time for Vindigni to prevent Ondato's being swung outboard, and whether he tried to stop the winch, but was unable to do so because the lever was too stiff; or whether he was not looking at Ondato at all until it was too late, even though the winch had been in good order. His testimony was, indeed, far from convincing. He had to be examined through an interpreter, always a most unsatisfactory method, and it is clear that he was puzzled to understand the details—to say nothing of any niceties—of the sequence of the events as they happened. Indeed, we dispose of the appeal upon the assumption that there were parts of his examination that contradicted what he said both before and after the passages that we quote in the margin:[2] passages, from which, tak-

---

1. The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241; The Southwark, 191 U.S. 1, 9, 24 S.Ct. 1, 48 L.Ed. 65; Petition of Reliance Marine, etc., Corp., 2 Cir., 206 F.2d 240, 243; The T. J. Hooper, 2 Cir., 60 F.2d 737.

2. "Direct Examination:

"Q. When you heard him yelling that the hook had got him what was the position of the lever of the winch? A. I was raising, and when he yelled I was trying to lower it and it was hard, and before I could stop it the winch was going up.

   *     *     *     *     *

"Q. At any time after you heard him yell and did the winch start going down? A. After I had placed my strength with

both hands, yes. I had to force it to lower.

   *     *     *     *     *

"Q. Mr. Winchman, you said you used both hands to force down this lever. Is that right? A. Yes.

   *     *     *     *     *

"Q. Were you looking at him all the time, or were you looking somewhere else? A. I was looking at him all the time.

"Q. Did you look at him before the sling came up? A. Yes.

"Q. Did you see the sling do anything to him? A. No.

"Q. Did you see a hook do anything to him? A. I saw the hook catch his glove.

"Q. You did see that, didn't you? A. Yes, sure.

en as they read, we think that a jury might have found that he saw Ondato's predicament in time, and tried to stop the rise of the hook, but failed because the lever worked too hard.

Thus, the appeal turns upon whether, read in the record as a whole, this testimony justified the action taken. The decisions on the general point are legion, and the rule has been stated in many forms. One of the latest in the Supreme Court was that of Reed, J., in Brady v. Southern Railway Co., 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239: "When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine" the suit. In Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720, Butler, J., put it as follows: "Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury. And in determining a motion of either party for a peremptory instruction, a court assumes that the evidence for the opposing party proves all that it reasonably may be found sufficient to establish, and that from such facts there should be drawn in favor of the latter all the inferences that fairly are deducible from them." Wigmore, § 2494 quotes, as "perhaps the best statement," that of Brett, J., in Bridges v. North London Railway, L. R. 7 H. L. 213: "The proposition seems to me to be this: Are there facts in evidence which if unanswered would justify men of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain?" However, there are difficulties in the path of applying this formula upon an appeal from an order that directs a verdict, owing to the preservation of no part of the evidence

"Q. And then what happened after that? A. And then I tried to stop the winch, but I could not.

"Q. And when the hook caught his glove was he then standing on the deck? A. Yes.

"Q. And how much further up did this winch go before he dropped it? A. About six feet. Almost six feet. Six feet from the bulwark.

*       *       *       *       *

"Q. And when did you first start to try to stop this winch from going up? A. When I saw him in the air.

*Cross Examination:*

*       *       *       *       *

"Q. So that if I understand you, right before this accident, when the hook was coming up from over the side, when you saw the hook level with the bulwark, you pushed your lever down to neutral. Is that what you say? A. When I was running the winch at the time of the accident the winch was running and the man who was on the Burton grabbed the canvas sling and the winch continued to run. I tried to stop it but could not.

*       *       *       *       *

"Q. Now, then, did you, after Mr. Ondato put his arm around the sling, lift the lever again to raise the hook? A. I never got to stop the winch. The winch continued to run because the lever was hard, and in order to stop the winch it was necessary for me to use both hands.

*       *       *       *       *

"The Witness: And the accident occurred the way I say, and I tried to stop the winch and the winch wouldn't stop, and that man was dragged four or five feet above the deck with the hook on his sleeve, or glove.

*       *       *       *       *

"Q. Now, did you see him catch his glove in the hook? A. Yes.

"Q. What did you do then? A. I tried to stop it and I could not. The winch continued to go.

"Q. What did you do to your winch? A. And then I put my both hands and my weight on it, and that is the way I stopped it.

*"Redirect Examination:*

"Q. Mr. Vindigni, from the time this sling started coming up from the lighter at the time of the accident until the time of the accident, when did the lever finally come down to a neutral position? A. When the canvas sling brings that swing, the violence with it, the winch is still running, and the man has it already in his hand, and when I tried to stop, the hook had already caught his glove, and the winch was still going up. It went up so far that it brought the man six feet high, and after he was taken six feet high, he fell down below. I tried to stop the winch and I could not. Then I put two hands on it, and my weight, and I stopped it."

except the uttered words. It is a trite commonplace that the jury may, and should, regard the deportment and address of a witness, whom it sees and hears, as a part of the evidence, and be guided accordingly. Moreover, we all know that these may be overwhelmingly convincing; so that the same words, when spoken by a witness who appears composed, self-reliant, alert, open and candid, will impose on his hearers a firm conviction, which, if uttered by a furtive, evasive, hesitant and uneasy witness would inevitably be rejected. There is no inherent reason why this part of the evidence should not make the truth manifest to any reasonable audience and in this way satisfy the exacting condition of a directed verdict: *i. e.*, that it may stand only when it is the only conclusion reasonably possible.

However, it is apparent that it would not generally be possible to do anything but affirm such a direction, if the appellate court was to make allowance for this kind of evidence; because, being lost, the court could not appraise its cogency, and without doing so, it would have no warrant for holding that the judge had been wrong. The only occasions on which it could properly reverse would be those, when it could see that, no matter how persuasive the lost evidence could have been, the written testimony was such that it must prevail. In Patton v. Texas & Pacific Railway Co., 179 U.S. 658, 660, 21 S.Ct. 275, 276, 45 L.Ed. 361, Brewer, J., pretty plainly assumed that upon such a motion the judge might rely upon his personal impressions of the witnesses: "He has the same opportunity that jurors have for seeing the witnesses, for noting all those matters in a trial not capable of record, and when in his deliberate opinion there is no excuse for a verdict save in favor of one party * * * an appellate court will pay large respect to his judgment." We have not found any other decision that seems to have so ruled, because in Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, the Court assumed that Bainbridge, the plaintiff's only witness, had not seen the two strings of cars collide, and that his credibility was not involved.

██ We cannot believe that the language quoted is to be taken as authoritative. The books are full to repletion with declarations that the credibility of witnesses is for the jury; it would be idle to pile up citations, which in addition to those we have mentioned, have repeated the doctrine. The most recent in the Supreme Court was the quotation *in extenso* in Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 628, 64 S.Ct. 724, 88 L.Ed. 967, from Aetna Life Insurance Co. v. Ward, 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371. The appeal was from a summary judgment in which the same question will always arise. For this reason we hold that an appellate court in passing upon a directed verdict must assume that the testimony of the witnesses for the losing party was entitled to the full measure of credibility that the most persuasive appearance and behavior in court would add to what they said. So judged we cannot agree that it was permissible in the case at bar to disbelieve the story told by Vindigni, the winchman, however implausible it may in fact have been to any fair minded person who heard him tell it. A jury, and only a jury, was free to discard it on that ground. It does not indeed follow that there can never be an occasion on which the cross-examination of a witness does not so plainly show that he is not to be believed, that the judge may not disregard his direct examination, and hold that the party having the affirmative must lose. The testimony of a witness, taken as a whole, may so clearly be a fabrication or an imbecility as to overbear any possible credence that his carriage and bearing could have given it. In the case at bar, the cross-examination of Vindigni did not go so far; as we have said, it did indeed leave much to be desired in point of definition and clarity; but we cannot agree that he might not properly have convinced the jury of the truth.

Judgment reversed; new trial ordered.