Sherwood **LESTER**, Libelant-Appellant,

v.

**UNITED STATES** of America,
Respondent-Appellant,

and

Marine Basin Company, Respondent-
Impleaded-Appellee.

No. 269, Docket 23867.

United States Court of Appeals
Second Circuit.

Argued March 14, 1956.

Decided June 4, 1956.

Louis Bloch, New York City (Edward J. Behrens, Gay & Behrens, New York City, of counsel), for libelant-appellant.

Warren E. Burger, Asst. Atty. Gen., Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., Paul A. Sweeney, Leavenworth Colby, John G. Laughlin, Attys., Dept. of Justice, Washington, D. C., for the United States, respondent-appellant.

William S. O'Connor, New York City, for respondent-impleaded-appellee.

Before FRANK, LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

Libelant, Sherwood Lester, instituted this proceeding in admiralty against the United States to recover damages for injuries sustained in a fall from the Q–100, a motor yacht owned and operated by the United States Army. The jurisdiction of the district court rests on the Public Vessels Act, 46 U.S.C.A. § 781 et seq.

The accident occurred on July 15, 1947, at a time when the Q–100 was high and

dry in the No. 2 dry dock of Marine Basin Co. On that date the Q–100 was undergoing a general overhaul by Marine Basin preparatory to transfer from service in the New York harbor and adjacent waters to the Great Lakes for the use of the Commanding General and staff of the Fifth Army at Chicago, Illinois. Libelant, who had had six years' experience working on drydocked vessels, was employed by Marine Basin as an assistant electrician. On the morning of the day of the accident he boarded the vessel, went to the pilot house and started work on the running light panel. To determine whether the vessel's running lights were operative, libelant left the pilot house, took three or four steps on the deck aft the pilot house (known as the "trunk top"), lost his footing and fell overboard to the floor of the dry dock. The weather was clear, and, as we shall see, the trial court found that the fall was not caused by the presence of oil, grease or other foreign substance on the trunk top. Thus, libelant, for some unexplained reason fell from an unobstructed and virtually level canvas-covered surface across and past the main deck to the floor of the dry dock below.[1] The fifteen-foot fall fractured both his legs, and as a result his left leg is permanently deformed.

The libel raised issues as to the negligence of government agents and as to the seaworthiness of the vessel. The charges of negligence and unseaworthiness were denied by the United States in its answer, and it was affirmatively alleged that libelant's injuries were caused solely by his own negligence. Pursuant to Admiralty Rule 56, 28 U.S. C.A., the United States petitioned to implead libelant's employer, Marine Basin Co., alleging, *inter alia*, that Marine Basin had contracted to indemnify and hold harmless the United States against all claims arising or resulting "from the fault, negligence, wrongful act or omission" of Marine Basin or its employees.

Libelant had alleged that his fall from the trunk top roof aft the pilot house was caused by the presence of oil, grease, or other foreign substance. The trial court found that libelant had failed to prove this charge: "[T]he libelant's evidence is devoid of demonstration of any oil, grease or other foreign substance which caused him to fall." No other causative explanation for the fall was advanced by libelant or found by the trial court. The court found, however, that if a 24-inch guard rail had been installed on the main deck bulwark cap rail, as originally provided for in Specification 1.15 of the contract of overhaul, libelant could have grasped it as he fell and thus saved himself from the injurious consequences of his fall. Exonerating libelant of all negligence, the court held that the failure of the United States to install the specified guard rail

1. A more complete statement of the undisputed facts concerning the Q–100 will help the reader to visualize the circumstances surrounding the libelant's fall. The Q–100 has an overall length of approximately 60 feet with a beam of 14 feet 6 inches and a draft afloat of about 4 feet. Her superstructure consists of a cabin extending forward from the cockpit at the stern to approximately 15 feet of the stem. Above the cabin and roughly at midships is the pilot house, entry to which is had by port and starboard doors opening aft onto the roof of the cabin. The roof of the cabin, or trunk top, is about 10 feet wide at the entrance to the pilot house and narrows to about 9 feet wide at the cockpit; it is a canvas-covered flush deck with a camber of about ¾ of an inch.

The main deck consists of port and starboard lateral passageways, approximately 18 inches wide, between the cabin and the bulwarks. The bulwarks extend about 14 inches above the main deck and are capped by a wooden rail 4 inches high. The trunk top roof is 18 to 24 inches above the main deck; access to the trunk top roof from the main deck is facilitated by collapsible steps affixed to the port and starboard sides of the cabin. When in service the trunk top roof of the Q–100 serves as a boat deck for a dinghy or skiff; it also houses the utility box containing propane gas bottles. On the day of the accident these items of the ship's gear were not in position, and the davits were not in place.

made the vessel unseaworthy, and awarded libelant $18,000.

With respect to the government's claim against Marine Basin for indemnity, the court found that the decision not to install the guard rail called for by Specification 1.15 was made by a government agent, not by Marine Basin, and that Marine Basin had not been negligent in failing to provide a guard rail or in any other particular. The court, holding that the contract of indemnity was inapplicable in the absence of negligence on the part of Marine Basin, therefore dismissed the impleading petition.

The libelant appeals from the decree on the ground that the recovery is inadequate; and the United States cross-appeals, asserting that the trial court erred in determining that libelant was not contributorily negligent, that the Q–100 was unseaworthy, and that Marine Basin was not obligated to indemnify the United States. Since we hold, on the basis of the undisputed facts and the facts found by the trial court, that the Q–100 was not unseaworthy, it will be unnecessary for us to consider the questions relating to damages and indemnification.

The trial court's conclusion that the Q–100 was unseaworthy because of the absence of a guard rail extending above the bulwark on the main deck was based entirely on the following reasoning: (a) the inclusion of a specification in the contract of overhaul, calling for the installation by Marine Basin of a 24-inch brass guard rail on the main deck bulwark, established that such a guard rail was necessary in order to make the vessel seaworthy; and (b) the absence of such a rail on the day of the accident was due to failure of the United States to adhere to the contract specification and was causally connected to libelant's injuries, since "the rail as contracted for in the quoted specification would have been available to libelant in the effort to save himself from going overside." [2] With the inferences of fact contained in (b) we have no quarrel, since we are mindful of the broad latitude accorded the trier of fact in determining facts and in drawing inferences as to a causal relation.[3] Therefore, we accept the trial court's finding that the decision to abandon the installation of the specified guard rail was made by a government agent, and its causal inference that if

---

2. In order to demonstrate the complete reliance of the trial court on the above reasoning, the following excerpts are quoted from its memorandum opinion [127 F. Supp. 414]:

"Had [Specification 1.15 providing for the installation of a main deck bulwark railing] been adhered to prior to July 15, it is reasonable to suppose that the libelant would not have fallen overside. The very presence in the contract of the quoted specification constitutes such a recognition by the Government of the necessity for this element of protection to those on board the vessel, that there is little room for argument that a business guest properly present on the vessel was not one of those whose safety was within the contemplation of the contracting parties.

\* \* \* \* \*

"\* \* \* the absence of the rail was no casual defect in the Q–100. On the contrary the Government contracted to provide it, and for failure to adhere to that purpose, which was not an inadvertent oversight, it must respond to this libelant unless it appears from the testimony that the deficient condition was unrelated to Lester's fall.

\* \* \* \* \*

"The cases relied upon to defeat libelant's cause have been examined \* \* \*. They all involve absence of a rail on a vessel under circumstances remote in fact from the evidence in this case. None of course contains any such element as the contractual recognition by the vessel owner of the necessity for installing a rail, the absence of which was causally related to personal injury.

"The word 'necessity' is used because otherwise the quoted specification would not appear in the contract for overhaul. \* \* \* [I]f the Q–100 had been deemed reasonably fit, etc., the Government would not have been at pains to contract to remedy an obvious deficiency. \* \* \* "

3. Schulz v. Pennsylvania R. Co., 350 U.S. 882, 76 S.Ct. 134, reversing our decision reported at 2 Cir., 222 F.2d 540; Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 64 S. Ct. 409, 88 L.Ed. 520.

the rail had been installed by the time of accident, libelant would have been able to grasp it as he fell from the trunk top above, thus saving himself from the serious consequences of his fall. But we are unable to agree with the trial court's conclusion that the presence of a specification in an overhaul contract, calling for the installation of certain guard rails, was determinative of the question whether such rails were necessary in order to make the vessel reasonably fit for the purpose for which it was then being used.

The seaworthiness of a ship, her equipment and appurtenance is a relative concept, dependent in each instance upon the circumstances in which its fitness is drawn in question. Thus in this case the crucial consideration is whether, in view of all the circumstances attending libelant's fall and the status of the Q–100 at the time, the Q–100 was, in all respects pertinent to the injury, reasonably fit to permit libelant to perform his task aboard the ship with reasonable safety.

The trial court erred in disregarding these considerations. It stated that Specification 1.15 in the overhaul contract between the United States and Marine Basin, calling for the installation of a hand rail, constituted a "recognition by the Government of the necessity of this element of protection to those on board the vessel, * * * "—in effect treating the inclusion of this specification as an admission by the United States that the vessel was unseaworthy without such a rail. We think it likely that the installation of a guard rail was desired because the United States Army thought such an improvement would be useful or necessary for the anticipated service of the Q–100 on the Great Lakes; but it is unnecessary to engage in conjecture concerning what the United States had in mind. Regardless of the possible past or future unseaworthiness of the Q–100 while in active service in the New York harbor or on the Great Lakes, because of its lack of main deck guard rails, the question involved in this case was whether the Q–100 was unseaworthy, because of the lack of such guard rails, as to those on board the vessel when she was in dry dock undergoing repair. Improvements undertaken by a shipowner do not constitute an implied admission that, without such improvement, the vessel is structurally defective and unseaworthy, particularly when the question involved is the unseaworthiness of the vessel while in dry dock and with respect to persons who, it is contemplated, will effect the improvement.

We do not think that the United States was under any obligation to provide the Q–100 with main deck guard railings against the remote possibility that an experienced dry dock worker such as libelant would fall from the trunk top roof some 18 to 24 inches above the main deck. Admittedly the absence of such guard railings might constitute unseaworthiness for some of the purposes to which the vessel was to be put;[4] but this does not mean that they were necessary to make the vessel seaworthy while it was motionless in a dry dock. Although the doctrine of seaworthiness has been extended in recent years to shorebased employees such as libelant, who are injured while working on board a vessel in port,[5] the measure of liability remains the same as that to seamen at sea: whether the vessel was reasonably fit for the purpose for which she was being used.[6] In Hanrahan v. Pacific

4. See Krey v. United States, 2 Cir., 1941, 123 F.2d 1008; Zinnel v. United States Shipping Board, 2 Cir., 1925, 10 F.2d 47.

5. Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143;

Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

6. See Boudoin v. Lykes Bros. S.S. Co., Inc., 1955, 348 U.S. 336, 338–340, 75 S.Ct. 382, 99 L.Ed. 354; Manhat v. United States, 2 Cir., 1955, 220 F.2d 143, 147–148; Freitas v. Pacific-Atlantic S.S. Co., 9 Cir.,

Transport Co., 2 Cir., 1919, 262 F. 951, certiorari denied 252 U.S. 579, 40 S.Ct. 345, 64 L.Ed. 726, we held that a ship which was in port and fast to a pier was not unseaworthy as to a crewman who had fallen overboard from an upper deck because it lacked hand rails: "Seaworthiness is a relative term; a vessel may have that quality in port, and yet be wholly unfit for rough water, McLanahan v. Universal Insurance Etc. Co., 1 Pet. 170, 7 L.Ed. 98; and to say that this ship was unseaworthy because she had no handrail up, while lying alongside a wharf discharging cargo, is merely untrue." 262 F. at page 952. See, also, Newport News Shipbuilding & Dry Dock Co. v. Watson, 4 Cir., 1927, 19 F.2d 832; Brick v. Long Island R. Co., 1927, 245 N.Y. 222, 157 N.E. 93. We think these precedents are authoritative under the circumstances presented here. The United States provided libelant with a motionless, unobstructed, and virtually level canvas-covered surface from which libelant, an experienced dry-dock worker, could observe whether the running lights were operative. With the exercise of reasonable care, libelant could have performed this task in safety.

We would affirm the decree below if, by application of the proper criteria to the facts as found by the trial court, we were able to find a reasonable basis for a conclusion that the Q–100 was unseaworthy at the time of libelant's fall. Likewise, we would remand for further findings of fact if any important factual issues had been left undetermined. However, since it is our view that the facts found by the trial court demonstrate that the trunk top roof of the Q–100 was a reasonably fit place for libelant to perform his task aboard the ship with reasonable safety, the decision below must be reversed.[7]

Reversed and remanded for dismissal of the libel.

1955, 218 F.2d 562, 564; Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397, 400; Ondato v. Standard Oil Co., 2 Cir., 1954, 210 F.2d 233–234.

FRANK, Circuit Judge (dissenting).

The trial judge, who saw and heard the witnesses when they testified, found that libellant was not negligent. This finding must be accepted by us since it is not "clearly erroneous." I agree with my colleagues in accepting the trial judge's conclusion that the absence of the guard rail was causally related to the accident. I disagree with my colleagues' conclusion that, in the circumstances, the Q–100 was nevertheless seaworthy.

The evidence shows that the overhaul contract, made before the accident, specifically called for a guard rail (but that for some reason it was never installed). My colleagues hold that the judge mistakenly considered this provision of the contract as evidence that the absence of the rail rendered the vessel unseaworthy. I would agree—see Wigmore Evidence, Section 283—if here there were a contract (or plan) to make an improvement *after* the accident. But I think that, since the respondent, *before* the accident, had planned to make this improvement, the judge correctly gave this evidence much weight.

My colleagues also say that, even if the vessel without the rail would have been unseaworthy when at sea, the same is not true of the vessel when in dry dock. This amounts to saying that the rail was essential for seaworthiness when and only when the vessel was in motion and in rough waters. I cannot agree. In Krey v. United States, 2 Cir., 123 F.2d 1008, we held the shipowner liable, on account of unseaworthiness, to a seaman injured when he slipped in a shower, despite the fact that the ship was in port. That here libellant, without negligence, fell from the trunk top, and suffered serious injury from the resultant fall, and that the fall would not have occurred if there had been a rail, serve to show that the vessel was not safe even when motionless. Nor are my colleagues correct

7. Since we hold that the ship was not unseaworthy we do not reach the question of whether the trial court's finding that libellant was not negligent is clearly erroneous.

in suggesting that libellant was engaged in the very repairs contemplated by the overhaul contract: He had nothing to do with the work of setting up a rail, for he was an electrical worker.

I consider easily distinguishable the cases on which my colleagues rely for their conclusion that the vessel was not unseaworthy. In Newport News Shipbuilding & Dry Dock Co. v. Watson, 4 Cir., 1927, 19 F.2d 832, 833, the court pointed out that "the launch in this case was employed in carrying heavy lines or hawsers about the shipyard, and it was equipped with a hand rail around its deck house and a coping around the outer deck a few inches high. It can readily be seen that a hand railing around the outer deck would greatly interfere with the handling of the heavy lines sought to be carried." On the basis of these facts, the court said, "Within the protected waters of the shipyard, where the launch plied (it did not go on protracted voyages or into rough water), it would seem that the lack of an outer guard rail did not render the launch unseaworthy or unfit for the service in which it was employed." In Brick v. Long Island R. Co., 245 N.Y. 222, 157 N.E. 93, 94, there was a guard rail sufficiently close to the point from which the seaman fell so that he could have grasped it, had he been careful: Cardozo, J. stated: "A boat is not unseaworthy because there are spaces here and there where a seaman, if awkward or inattentive, may find it possible to fall." That is not this case. Here the vessel had no guard rail at all along the main deck, and (to repeat) we must accept the finding that libellant was not negligent. In Hanrahan v. Pacific Transport Co., 2 Cir., 262 F. 951, the court assumed that the plaintiff was injured by the negligence of the ship's officers in not replacing a guard rail that had been temporarily removed, but the court decided for the ship's owner on the sole basis of the rationale of Hedley v. Pinkney (1894), App.Cas. 222 and Olson v. Oregon Coal & Navigation Co., 9 Cir., 104 F. 574. Those cases held that, when a ship's equipment is adequate but the equipment is not adequately used because of the negligence of the injured seaman's fellow servants, if the ship is thereby rendered unsafe, the owner is not liable. We have rejected such rulings; Mollica v. Campania Sud Americana, 2 Cir., 202 F.2d 25; cf. Grillea v. United States, 2 Cir., 232 F.2d 919, on rehearing.

The general statements in the cases, on which my colleagues rely, related to facts different from those involved in the instant case. See Wason v. Sanborn, 45 N.H. 169, 170: "Whenever a fixed and certain rule can be established, it is immensely important that it should be. But there is a large class of cases and of questions, where the circumstances admit of so numerous variations, that no rule can be framed comprehensive enough to reach them. In such cases decisions must be made in the exercise of a sound judgment upon all the circumstances, and such decisions can furnish rules for new cases, only where the same circumstances occur, yet there is a constant striving to treat them as precedents, and to regard the expressions used by the courts in stating the grounds of their decisions, and which are true perhaps in regard to the case in hand, as universally true." [1]

---

1. See also Chafee, Simpson and Maloney, Cases on Equity (1951) 1058–1059.