Lowell **NETERER**

v.

**UNITED STATES of America.**
No. 4043.

United States District Court
D. Maryland.
May 19, 1960.

James T. Smith, Baltimore, Md., for libellant.

Leon H. A. Pierson, U. S. Atty., William J. Evans, Asst. U. S. Atty., and Randall C. Coleman, Jr., Ober, Williams, Grimes & Stinson, Baltimore, Md., for respondent.

R. DORSEY WATKINS, District Judge.

This libel, brought by the First Assistant Engineer of the USNS Esso Cumberland, against its owner, the United States (Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.) is in two counts. The first, allegedly under the Jones Act,[1] asserted that libellant, when carrying tools and parts pursuant to the order of the Chief Engineer, "stepped on oily shavings on the deck of the machine shop, causing him to fall across the deck of the machine shop," resulting in permanent injuries.[2] The second count was for maintenance and cure.

Respondent admitted the relationship of the parties and the applicability of the Jones Act, but denied knowledge or information sufficient to form a belief as to the truth of the allegations as to the occurrence of libellant's fall, or the nature or extent of his injuries.

As a separate defense, respondent alleged that any injuries sustained by libellant were caused in whole or in part or were contributed to "by the negligence or fault or want of care of the libellant and not by any negligence or fault or want of care on the part of the respondent or by any unseaworthiness of the USNS Cumberland."

At the trial libellant's proctor orally moved for leave to file an amended libel

---

1. 46 U.S.C.A. § 688; 45 U.S.C.A. § 51.

2. Note that no negligence on the part of respondent is alleged; and that there is no formal allegation of an unsafe place in which to work or of unseaworthiness.

to allege "unseaworthiness." With consent of respondent, leave was granted as prayed, and the amended libel was filed. The new material, incorporated in paragraph Eleventh A, is as follows:

"That the said accident and occurrence was caused wholly and solely through the negligence of the Respondent, its agents, servants and employees in failing and neglecting to provide Libelant with safe, proper and seaworthy appliances and appurtenances aboard the said S. S. Esso Cumberland; in failing and neglecting to provide Libelant with a safe and proper means of ingress and egress and in failing and neglecting to provide Libelant with safe, proper and competent superior officers."

At the trial libellant's proctor admitted in open court that libellant had been paid full wages to the end of the voyage, and all maintenance and cure to which he is entitled. A decree was accordingly directed for respondent on the second count.

On June 12, 1957, when the accident was alleged to have occurred, libellant was forty-nine years of age. He had been a marine engineer since 1943 and had held a Chief Engineer's License, Steam Unlimited, for eight years, but had never sailed at a higher rating than First Assistant Engineer. He had joined the Cumberland in December, 1956, through the Marine Engineer's Beneficial Association hiring hall, and after routine examination signed on as Second Assistant Engineer. Within a few weeks he became First Assistant Engineer, serving until the middle of March, 1957, when he obtained a three-week's leave of absence for personal reasons.[3]

Libellant returned to his ship on April 10, 1957. He denied any prior difficulty with his legs or knees, and there is no history of any disability before his alleged injury.

According to libellant, for some two days before June 12, 1957, the Chief Engineer had been working steadily in the machine shop room on a "heat exchanger". This required the use of a drill press to bore a number of holes in a one-inch plate. A light cutting oil was used as a lubricant, and substantial quantities of steel shavings accumulated around the drill press, and for some feet in front of it. The temperature in the machine shop room was about 120° F., and the oil would run freely off the shavings. Libellant claims that he called the attention of the Chief Engineer to the shavings, which might "fly" some six to eight feet from the drill press, and that the Chief told him to have the "wipers" clean up if he was not satisfied with the condition. The Chief had no recollection of any such conversation, but said that if libellant had said anything about the condition of the machine shop floor, the Chief would have told libellant to have the wipers clean it as often as libellant thought it necessary.

There was complete agreement that while the Chief Engineer had technical supervision over and responsibility for the Engine Department, libellant as First Assistant Engineer was directly in charge of maintenance; that it was his job to see that the wipers kept the machine room clean; and that orders to the wipers were generally given by the First Assistant Engineer.

Libellant had the wipers clean the machine shop room on the day libellant first noticed the shavings, and instructed

---

3. Libellant testified that he had undergone a hernia operation on September 10, 1956; that he feared he had strained himself and desired a medical examination; that he was examined by the United States Public Health Service and was told that nothing was physically wrong in the hernia site, but that he was "scared and tense, and needed to relax." This reassured him; he did relax, and his trouble disappeared.

Libellant also took a few days to adjust certain domestic problems.

Libellant's superior, Chief Engineer Thompson, testified that libellant had requested, and been given, time off in March 1957, for personal reasons, including "trouble with his left knee or leg." On cross-examination he referred to this as "trouble with his leg, or a trick knee"; Thompson could not say which.

them to clean it at 8 a. m., at noon, and at 5 p. m. on any occasion when the Chief was working and shavings were being created. Apparently this was done. In any event, libellant testified that the machine shop floor had been swept at 1 p. m. on June 12, 1957.

On that day, during his lunch hour, libellant noticed water coming from the store room, which he believed to be from a break in the main circulating water line to the two ice machines. When he finished lunch, he had the pumps and machines shut down, and began repairs;— a routine job. Shortly afterwards, the Chief resumed his work at the drill press. Libellant says he told the Chief what he was doing, and the Chief told him to keep on. The Chief has no recollection of the conversation. The Chief testified that it would not have been necessary to have shut down the ice machines; that circulation could have been continued by hooking up to the fire line.

Libellant had safely made some eight to ten trips through the machine shop room to secure or replace parts between 1 and 2 p. m., and had made two other trips after 2 p. m. and before the accident, which he placed at just before 3 p. m. Libellant said he was starting to go into the machine shop, with some nipples in one hand and elbows in another, but not enough to overbalance him;[4] that he was coming down two steps and "thinks" that his left foot was on the deck and his right foot was coming off the bottom step, and about ten to twelve feet from the drill press, when he "slipped" on some chips and a light film of oil; "something made me slip; I felt my left foot go a little bit, then stop"; he fell directly forward, both knees hitting the deck; he was "forced to assume" it was shavings; he slipped, and

that was the only thing present. The area was well lighted; he looked where he was going, and saw some chips, but not the one he stepped on.[5]

Of some significance is the fact that there is no record that libellant ever reported at any time that he slipped on a chip or chips. The personal injury report[6], signed by libellant, states in part:

"Stepping down into the machine shop, I twisted my left leg and affected the muscles along side of the knee cap. I noticed a sharp pain at the time, but felt I would shake off the bruise or whatever did actually happen to the area of my knee cap * * *."

In the abstract from the clinical record at United States Public Hospital, Baltimore, Maryland, under "Reason for Present Admission"[7] appears:

"Two months prior to admission, while entering a room on board ship, on one step his left knee gave way and he fell to the deck."

Libellant contends that the mere presence of shavings, mixed with oil, made the ship unseaworthy, and that libellant, falling thereon, is entitled to recover. Alternatively, he apparently contends that even if the alleged condition did not constitute unseaworthiness, libellant was acting in an emergency, distracting his attention from (an apparently) normal condition, and thus allowing recovery.

The court finds that libellant has failed to prove by a preponderance of the evidence that his fall was occasioned by any unseaworthy condition of the ship. While *he* may be "forced" to assume that he slipped on shavings, the evidence is at least as consistent with him overbalancing, or simply slipping because of the nature of the step he voluntarily took in

---

4. In his deposition of March 20, 1959 libellant had said that what he was carrying was enough to overbalance him. He explained the discrepancy by saying that he meant that with his hands full he would have been unable to grab a (nonexistent) hand rail.

5. In his deposition he said that he looked and did not notice any chips as he came into the machine shop room.

6. Dated June 15, 1957. It reports the injury as having occurred on June 14, 1957, at 3:30–3:45 p. m. Respondent has made no point as to the variations in date and time.

7. After "Reason for Present Admission" is the parenthetical instruction: "If injury, give date, place, and brief description of accident causing injury."

the particular instance; or by the postural twisting or giving way of his leg, as the reports indicate. The court finds as a fact, and concludes as a matter of law, that if an unseaworthy condition existed, it was not a proximate or contributing cause of libellant's fall.

Neither is the court able to find any emergency condition, even if this, if found, would allow recovery. Libellant had made the same trip safely some ten to twelve times previously without difficulty; he admittedly had sufficient help available; and he could have had a wiper clean the deck or any part at any time that he, whose duty it was so to determine, should decide that an unsafe condition existed.

■ These holdings, if correct, are dispositive of the case. However, alternatively, the court finds as facts and concludes as matters of law, that the ship was not unseaworthy or respondent negligent. The obligation of the vessel's owner is not that of an insurer of the seamen; a vessel does not need to be free from all cause for mishap; it is enough if she is reasonably fit.

"* * * The seaworthiness of a ship, her equipment and appurtenance is a relative concept, dependent in each instance upon the circumstances in which her fitness is drawn in question. The crucial consideration is whether the ship was, in all respects pertinent to the injury, reasonably fit to permit libellant to perform his task aboard the ship with reasonable safety. Lester v. United States, 2 Cir., 234 F.2d 625, 628. * * *" (Ross v. Steamship Zeeland, 4 Cir., 1957, 240 F.2d 820, 822.)

As was said by the majority in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 933, 28 L.W. 4293:

"* * * What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354]."

■ The court finds as a fact and concludes as a matter of law that at the time libellant was injured, the vessel was reasonably fit for libellant to perform his work with reasonable safety.[8]

Were there liability, the court would find that libellant, after his injury, was reasonably treated as for a sprain; that his condition, after three days of rest, improved, and he was able to resume his regular duties together with extra watches, until an injury to the Second Assistant Engineer required libellant to work twelve hours a day for more than two weeks; his knee began to swell, and when he was examined in Aruba, an operation was advised. He was flown from Aruba to Jacksonville, Florida, to

---

**8.** These findings are intended to exonerate the vessel and respondent, whether liability is sought to be couched in terms of unseaworthiness or negligence, or unseaworthiness resulting from negligence. Libellant fell at a point some twelve feet from the drill press. His contention was that chips or shavings might be thrown a maximum of eight feet. The Chief, an experienced mechanic, testified that a drill press would not throw chips or shavings more than four feet; and not that far in the manner he was operating it.

Libellant also contended that the Chief let shavings fall on the floor, instead of collecting them in a pan underneath the drill press. The Chief testified that as shavings would collect on the press, he would sweep them into a bucket, for his own safety; and that the drill press had a clearance of only a few inches off the floor, which would not permit a pan to be placed under it.

On these conflicts the court accepts the testimony of the Chief rather than that of libellant, based upon the Chief's greater experience and more convincing manner on the stand.

Washington, D. C. and taken by train to Baltimore, Maryland. After a lapse of several days for personal reasons, he entered the United States Public Health Service Hospital at Baltimore, Maryland, where an operation was performed for a torn medial meniscus. His post-operative history was uneventful, and on October 14, 1957 he was released as fit for duty. After a few more days devoted to personal affairs, libellant visited the offices of the company which had operated the Cumberland (which vessel had then been and still is withdrawn from service). He was told that he might secure re-employment through this agency about December 15, 1957, but with no firm promise.

Libellant registered at Union Hall and received his first assignment on January 10, 1958 as a Junior Engineer.[9] This particular employment he held for six months. Since that time he has sailed as Junior, Third Assistant, and Second Assistant Engineer. He claims that he has not accepted the position of First Assistant, although it has been offered to him, because it would require "too much running around."

Libellant's testimony, while indicating that probably he sailed at lower ratings than he might have received had he waited,[10] is deficient in showing any specific opportunity or opportunities, except for his injuries, to sail sooner, more frequently, or at higher classifications than those accepted by him. Furthermore, his

gross earnings were not shown to have declined.

Libellant has had an excellent recovery from his operation. An examination on March 24, 1960 by the orthopedic surgeon who operated showed only a minor loss of circumference in the lower left leg, with excellent strength, no loss of range of motion, no sensory changes and no arthritic changes. In his opinion the operation would not interfere with libellant's walking; it would have only a "minor effect on his work as a marine engineer," although he would tire more quickly. The orthopedic specialist fixed permanent partial disability at 10–15 per cent.[11]

Libellant's only present complaints are that on working more than eight hours, his knee becomes dull and numb, but if rested for eight hours it clears up; and that he can kneel only about one third as long on the left knee as on the right.

■ The court would, if required to determine damages, fix $7,500 as fair compensation for pain, suffering, permanent partial disability, loss of earnings and earning capacity; but would find that libellant contributed to his own losses and injuries to the extent of at least seventy-five per cent.[12]

The foregoing embodies the court's findings of fact and conclusions of law under Admiralty Rule 46½, 28 U.S.C.A.

The clerk is instructed to enter a decree for the respondent.

9. Athough he could have waited for assignment as First Assistant Engineer, he claims that that assignment would have required more climbing than he was then able to do. Moreover, "not many jobs were coming in."

10. Libellant's and Thompson's testimony makes it abundantly clear that shipping of licensed officers on American vessels since 1957 has been "rough." There is strong implication that engineers holding a Chief's license were content to sail in much lower classifications, both for more steady employment, less responsibility, easier work—assisted by frequent increases in salaries in all classifications.

11. He said there would have been considerable pain on the first day after the operation, decreasing over three to four weeks; stiffness for five to six days; within four to six months a patient should feel all right.

Force, with a shearing type mechanism would produce the tear; a "slip" could have caused it.

12. Even were there liability on respondent's part, the cause of libellant's injuries would be traceable primarily to libellant's failure to carry out his duties generally. His contributory negligence likewise is evidenced by his familiarity with the entire physical conditions and by the ease with which he could have avoided or eliminated any risk.