## EVERETT CLIFTON, Plaintiff

### v.

## VOYAGER INC., CAPTAIN FRANK GARGAS, IN PERSONAM, DOES I-V AND THE M/V VOYAGER, HER ENGINES, BOILERS, NETS AND FISH CARGO IN REM, Defendants

High Court of American Samoa

Trial Division

CA No. 4-92

November 28, 1995

Before RICHMOND, Associate Justice, VAIVAO, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Roy J.D. Hall, Jr.
 For Defendants, William H. Reardon

Opinion and Order:

## I. INTRODUCTION

This action is brought under the Jones Act, 46 U.S.C. App. § 688, and general maritime law to recover for injuries sustained by plaintiff Everett Clifton ("Clifton") during his tenure on the defendant *M/V Voyager* ("the vessel") in 1991. The trial began on April 18, 1995, and concluded on April 26, 1995. Having carefully considered the evidence and the applicable law, this court now issues its opinion and order embracing findings of fact and conclusions of law.

## II. FACTS

During the last week of July 1991, Clifton was hired to work as a deckhand and oiler aboard the vessel, a purse seiner, during a fishing trip. Defendant Captain Frank Gargas ("the captain") was the master of the vessel and a principal of the corporate owner of the vessel, defendant Voyager Inc. ("the owner").[1] Prior to this time, Clifton had worked for many years in the fishing industry. He had worked as a deckhand, and, as early as 1987, as an assistant engineer. At the age of 26, he was planning to make fishing his career.

About two weeks after the vessel had begun its journey, its fishing net became entangled around its propeller. Either the captain or his son, Steven Gargas ("the navigator"), was piloting the vessel, while the other was spotting for fish in the vessel's helicopter.[2] The vessel routinely deployed its net by having a skiff pull the net while the vessel circled about. When the vessel reversed its engines, the net contacted the propeller and became severely entangled about and fused to it.

Because of his experience as a diver, Clifton volunteered to assist the captain and the navigator in diving to remove the net from the propeller. The work took approximately six to eight total hours, and the men were limited to using a small knife, a pry bar, and a hammer and chisel. The work took place in a moderately rough sea, with a swell of approximately 10 feet. Because the net had melted to the propeller shaft, the work was quite difficult, and the men were required to hang on with one hand and cut with the other as the ship rose and fell on the swell.

The work fatigued the men and they felt beat up. Most of their pain went away in a matter of days, except for pain which Clifton was experiencing in his hands and wrists. His hands felt as if they were asleep, with a "pins and needles" sensation, a loss of dexterity, and significant pain. Clifton was only able to sleep a few hours each night because of the pain. He tried putting hot and cold water on his hands to no avail. He also took sleeping pills in an attempt to help him sleep better. Although Clifton reported the injury to the navigator, he did not tell the captain, who claims to have had no knowledge of the injury until after the vessel had returned to port. Clifton was unable to perform duties requiring

---

[1] Apparently, Voyager Inc. was both the vessel's owner and Clifton's employer. Although we refer to it, for simplicity's sake, merely as "the owner," it is still fully liable as Clifton's employer. *See infra* § IV(H)(1).

[2] The testimony was unclear as to who was piloting the vessel and who was in the helicopter. However, it is irrelevant to our analysis whether the captain or the navigator was piloting the vessel.

extensive use of his hands, which he tried to reduce. His pain increased over the next month until the vessel returned to port.

Upon arriving back in Pago Pago on September 4, 1991, Clifton went to Lyndon B. Johnson Tropical Medical Center, where Dr. Ronald W. Vineyard diagnosed him with Carpal Tunnel Syndrome ("CTS") in both wrists. Dr. Vineyard recommended that the seaman undergo carpal tunnel release surgery to reduce the pain. Clifton had the surgery, first on his right wrist and two weeks later on his left wrist.

All doctors who examined Clifton have attributed his CTS to the work he did while on board the vessel. Dr. Vaiula Tuato'o, testifying at trial, stated that CTS can be caused by a single traumatic incident and that there was no evidence of long-term or repeated-stress injury to Clifton's hands or wrists. Dr. Vineyard stated that the "cause and effect relationship[] . . . is obvious." We are persuaded by the medical testimony that Clifton's injuries were caused by his work in removing the net from the vessel's propeller.

Although the release surgery was effective in reducing Clifton's pain, he was unable to return to work on the vessel. The captain indicated that he probably would have hired Clifton for another voyage but for his disability. Because of the injuries to his wrists and hands, Clifton will be unable to work again as either a fisherman or a commercial diver. The owner paid Clifton maintenance for 90 days at a rate of $12 per day, but has paid him nothing more.

Clifton claims that, after four years, he still feels pain in his wrists and hands, particularly when lifting, and that he must wear special braces to perform such work. He was examined at the Straub Clinic and Hospital, Inc., in Honolulu, in July 1992. The doctor there diagnosed him as having "mild to moderately severe chronic Carpal Tunnel Syndrome" in his right wrist, and "moderately severe chronic Carpal Tunnel Syndrome" in his left wrist. In September 1994, Clifton was examined by Dr. Tuato'o, who found that, at that time, Clifton was suffering from 25% disability of each hand and 23% disability of each arm. He noted that these conditions may improve with time.

Clifton's wrists and hands remain functional for many purposes. He walked on his hands at a local restaurant during a New Year's Eve party in 1993. He has returned to work, briefly as a cashier, and then full-time with Safety Systems since July 1992. Although he is relegated to doing paperwork when his hands hurt, Clifton has apparently never missed a day of work at Safety Systems. However, he will never be able to return to work as a fisherman.

# III. JURISDICTION

## A. *Sua Sponte* Consideration of Subject Matter Jurisdiction

Neither party has raised an issue with regard to jurisdiction. However, T.C.R.C.P. 12(h)(3) mandates that "[w]henever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added). This rule, like the rest of our rules of civil procedure, parallels the federal rule. *Compare* T.C.R.C.P. 12(h)(3) *with* F.R.C.P. 12(h)(3). Under the Federal Rules, the court, whether trial or appellate, is obliged to notice want of subject matter jurisdiction upon its own motion. *Sumner v. Mata*, 449 U.S. 539 (1981).

Rule 12(h)(3) is important in the federal context because federal courts are courts of limited jurisdiction. The High Court, on the other hand, is a court of general jurisdiction, *see* A.S.C.A. § 30208(a) (1992), and Rule 12(h)(3) plays a less significant role. Nevertheless, there are areas of jurisdiction which are denied this court by federal statute. *See, e.g.*, *Gray, Cary, Ames & Frye v. HGN Corp.*, 6 A.S.R.2d 64, 69-70 (1987) (finding that the High Court lacks jurisdiction to enforce Ship Mortgage Act). Our civil practice must conform as closely as practicable to the practice provided for in the Federal Rules. A.S.C.A. § 43.0201 (1992). Therefore, we must, as the federal courts must, raise *sua sponte* the question of subject matter jurisdiction where it may result in dismissal of all or part of a suit.

## B. Maritime Jurisdiction

This court has general maritime jurisdiction under A.S.C.A. § 30208(a)(3). *Gray*, 6 A.S.R.2d at 70. This includes both *in rem* and *in personam* jurisdiction in matters of maritime common law. A.S.C.A. § 30208(a)(3) (1992); *Gray*, 6 A.S.R.2d at 70; *In re Complaint of Interocean Ships*, 2 A.S.R.2d 76, 80 (1985).

This jurisdiction, however, does not automatically extend to all federally created causes of action. For instance, in *Gray*, we held that "vessel owners cannot take advantage of the Ship Mortgage Act here." *Gray*, 6 A.S.R.2d at 69. The Ship Mortgage Act granted subject matter jurisdiction "to the district courts of the United States *exclusively*." 46 U.S.C. App. § 951 (repealed) (emphasis added).

The Jones Act, in contrast, does not grant exclusive jurisdiction to the district courts. It provides only that "[j]urisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located." 46 U.S.C.S. § 688(a) (Law.

Co-op 1987). Although § 688 reads in terms of jurisdiction, it is really a venue statute. *See Pure Oil Co. v. Suarez*, 384 U.S. 202 (1966); *Penrod Drilling Co. v. Johnson*, 414 F.2d 1217 (5th Cir.), *cert. denied*, 396 U.S. 1003 (1969); *Branic v. Wheeling Steel Corp.*, 152 F.2d 887 (3d Cir. 1945), *cert. denied*, 327 U.S. 801 (1946). Thus, the text of the Jones Act itself does not deny this court jurisdiction.

In addition, the United States Congress has recently condoned the High Court's jurisdiction over maritime matters. For instance, in repealing and replacing the Ship Mortgage Act, the very statute under which this court held it had no jurisdiction in *Gray*, Congress defined the courts having original jurisdiction to include this court. *See* 46 U.S.C.S. §§ 31301, 31304 (Law. Co-op 1987 & Supp. 1994).

■ We hold, therefore, that in addition to the power to exercise jurisdiction over the general maritime claims of unseaworthiness and maintenance and cure, this court can exercise jurisdiction over Clifton's Jones Act claim.

## IV. DISCUSSION

### A. Unseaworthiness

■ Clifton first alleges that the vessel was unseaworthy. Under general maritime law, an owner or operator of a vessel has an absolute duty to ensure that the vessel is seaworthy. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 542 (1960), *superseded by statute on other grounds*; *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983). This is a no-fault duty, and no showing of negligence or knowledge is required. *Id.* at 549. A seaworthy vessel is one that is reasonably fit and suitable for its intended use. *Id.* at 550. To prevail on his claim, a plaintiff must show both unseaworthiness and proximate causation. *Nelsen v. Research Corp. of the Univ. of Hawaii*, 805 F. Supp. 837, 850 (D. Haw. 1992).

■ The condition of seaworthiness is a relative one. "Unseaworthiness, in personal injury matters, does not necessarily mean that the defective condition be of such a quality as to render the entire vessel unfit for the purpose for which it was intended." 2 MARTIN J. NORRIS, THE LAW OF SEAMEN § 27:2 (4th ed. 1985) [hereinafter NORRIS, SEAMEN] . A ship can be unseaworthy as to only one seaman. *Id.* A condition of unseaworthiness can arise once the ship has set out to sea or from a transitory condition. *See, e.g., Mitchell*, 362 U.S. 539 (stating that unseaworthiness can arise from a temporary condition just as from a permanent condition); *Lester v. United States*, 234 F.2d 625 (2d Cir. 1956) (vessel without guardrail may be seaworthy in dry dock but unseaworthy at sea), *cert. dismissed*, 352 U.S. 983 (1957).

■ The factfinder determines the question of seaworthiness. *See Nelsen*, 805 F. Supp. at 850. Where a plaintiff pleads both Jones Act negligence and unseaworthiness, a showing of negligence also establishes unseaworthiness. *Lee v. Pacific Far East Line*, 566 F.2d 65, 67 (9th Cir. 1977). Although we believe Clifton succeeds on his claim for negligence, *see infra* § IV(B), we also believe the vessel was unseaworthy at the time of Clifton's injury independent of such negligence.

We have no doubt that a vessel with a disabled motor and no other means of propulsion is unseaworthy. This is particularly true when a vessel's disability arises from its own fishing net becoming entangled about and fused to its propeller. Defendants' own expert referred to a vessel in such condition as "dead in the water." Thus, we find, as a matter of fact, that the vessel was unseaworthy during the entire time Clifton was aiding in freeing the propeller from the net.

■ Clifton must next prove that his injury was proximately caused by the unseaworthy condition. *Nelsen*, 805 F. Supp. at 850. That is, the unseaworthy condition must have played a substantial part in bringing about or actually causing the injury, and the injury must be either a direct result or a reasonably probable consequence of the unseaworthy condition. *See Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1355 (5th Cir.), *cert. denied*, 488 U.S. 968 (1988). To show proximate cause, Clifton offered Dr. Tuato`o's testimony and Dr. Vineyard's signed letter of October 24, 1991. Both doctors attributed Clifton's CTS to his work in removing the tangled net from the vessel's propeller. Dr. Vineyard called this "cause and effect" relationship "obvious." Pl. Ex. 2 at 2.

Defendants have offered no evidence to counter the doctors, other than an *unsupported assertion in their brief that* "[i]t is well-established in the medical field that carpal tunnel syndrome cannot result from work lasting only a few hours." Def.'s Trial Br. at 9. The testimony by Clifton's experts flatly contradicts this assertion. Because we are more inclined to believe the medical doctors than defense counsel on medical issues, we find that Clifton's injuries were proximately caused by the unseaworthy condition of the vessel.

Thus, Clifton has proven every element of his unseaworthiness claim and is entitled to recover under this theory.

## B. The Jones Act

Clifton has also alleged that the vessel was operated negligently and seeks to recover under the Jones Act, 46 U.S.C. App. § 688. Under the

Jones Act "[a]ny seaman who shall suffer personal injury in the course of his employment may . . . maintain an action for damages." In other words, the Jones Act created a cause of action sounding in negligence for seamen against their employers in the same way that the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 *et seq.*, extended such a cause to railway employees, because of the high rate of injury to workers in these fields. *Lewy v. Southern Pacific Transportation Co.*, 799 F.2d 1281, 1288 (9th Cir. 1986) (FELA); *Nelsen*, 805 F. Supp. at 848.[3]

■ There are two elements which a plaintiff must prove in a Jones Act negligence claim: (1) that there was a negligent act by the defendant, and (2) that there is a but-for causal connection between the act and the injury. *See* 2 NORRIS, SEAMEN § 30:34.

We are unable to understand how a fishing net becomes severely entangled around a vessel's propeller in the absence of negligence. Defendants tell us in their trial brief that "[i]t is not unusual for the net on a purse seiner to become caught in such a manner." Def.'s Trial Br. at 2. Yet the captain testified that in his nearly 50-year career, a net had only become entangled four or five times. This hardly seems common to us.

■ Additionally, the Jones Act is to be liberally construed in favor of plaintiffs. *Arizona v. Anelich*, 298 U.S. 110, 123 (1936); *see also Jamison v. Encarnacion*, 281 U.S. 635, 640 (1930) (under FELA the word "negligence" is "to be construed liberally"). The "slight negligence" necessary to support an action under FELA or the Jones Act is defined as a failure to exercise great care, and that burden of proof is much less than the burden required to sustain recovery in ordinary negligence actions. *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969); *Nelsen*, 805 F. Supp. at 848. Evidence of even slight negligence is sufficient to find liability under the Jones Act. *Johnson v. Offshore Express*, 845 F.2d 1347 (5th Cir.), *cert. denied*, 488 U.S. 968 (1988).

As we stated above, we find it impossible to understand how a fishing net becomes entangled around a vessel's propeller in the absence of negligence. Defendants have given us no evidence which persuades us otherwise. This case approaches one of *res ipsa loquitur*. Defendants exercised exclusive control over the placement of the nets and the piloting of the ship. If the currents were too strong or other factors weighed against deploying the net, the captain should have waited until a

---

[3] According to the explicit terms of the Jones Act, it is to be interpreted in accordance with the interpretation of FELA. *See* 46 U.S.C.S. App. § 688 (1987).

later time. We find that the net became entangled in the propeller due to the captain's negligence.[4]

■ Clifton must next prove causation, but this burden is minimal. If the employer's negligent act or omission played any part, however slight, in bringing about the injury, the employer is liable. *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 506 (1957) (FELA); *Belanger v. Cenac Towing Co.*, 1989 U.S. Dist. LEXIS 8755 (E.D. La. 1989) ("Under the Jones Act, 'negligence is a legal cause' of damage if it played any part, no matter how small, in bringing about or actually causing the injury or damage."). On the issue of causation, the Fifth Circuit has said that "[u]nder this statute [FELA] the test . . . is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." *Boeing*, 411 F.2d at 506. Unlike general maritime law, a showing of proximate causation is not required. *Litherland v. Petrolane Offshore Const. Svcs.*, 546 F.2d 129, 132 (5th Cir. 1977). "[T]he plaintiff need not show that the conditions aboard . . ., or the stresses and strains placed upon [plaintiff] were the sole cause or main cause or even a significant cause of his injuries; they need only have been a contributing cause." *Curry v. United States*, 327 F. Supp. 155, 164 (N.D. Calif. 1971).

■ Given this "feather-weight" burden, *see Yelverston v. Mobile Laboratories, Inc.*, 782 F.2d 555 (5th Cir. 1986), Clifton has easily proven but-for causation. That is, but for the negligent entanglement of the net in the vessel's propeller, the captain and navigator would not have been required to cut the net away and Clifton would not have received the injuries to his wrists and hands. Defendants' argument that the injury was unforeseeable does not help them. The foreseeability requirement has been minimized under FELA and the Jones Act to the point where it

---

[4] Although the captain may not have been the sole negligent actor, it is unnecessary for us to determine this issue to dispose of this case. Clifton has alleged that the navigator may also have been negligent in piloting the ship when the net became entangled in the propeller. However, Clifton has not brought a separate negligence claim against either the captain or the navigator. His only claims are for unseaworthiness, Jones Act negligence, and maintenance and cure, all of which lie against the owner and the vessel. *See infra* § II(G)(1)-(2). None of these causes allows Clifton to recover against either the captain or the navigator. *See infra* § II(G)(3). Furthermore, the owner, as Clifton's employer, is vicariously liable to the same extent for the negligent acts of either the captain or the navigator. *See infra* § II(G)(1). Thus, it is unnecessary for us to determine whether the navigator or any other actor was liable in addition to the captain.

is "not necessary that respondent be in a position to foresee the exact chain of circumstances which actually led to the accident." *Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 523 (1957).

Thus, we hold that Clifton has also proven every element of his Jones Act claim and is entitled to recover under this theory as well.

## C. Affirmative Defenses to Unseaworthiness and Jones Act Claims

Defendants have presented a number of affirmative defenses to the unseaworthiness and Jones Act claims. We deal with each in turn.

### 1. The Primary Duty Rule

Defendants have asserted the primary duty doctrine as a contributory negligence defense, claiming that it bars Clifton's recovery. Defendants' argument, however, evinces a fundamental misunderstanding of this rule.

Defendants rely upon *Reinhart v. United States*, 457 F.2d 151 (9th Cir. 1972), and *Bernard v. Maersk Lines, Ltd.*, 22 F.2d 903 (9th Cir. 1994). These cases are apposite to defendants' case, however. In *Reinhart*, the court held that the injured seaman was contributorily negligent for the injuries he received from defective equipment that he knew about and had an affirmative duty and opportunity to repair. The court also held, however, that where there is no proof that the libelant had assumed a duty and responsibility to maintain and repair, there is no contributory negligence. *Reinhart*, 457 F.2d at 155, *citing Hudson Waterways Corp. v. Schneider*, 365 F.2d 1012, 1016 (9th Cir. 1966); *Nelsen*, 805 F. Supp. at 851.

The more recent *Bernard* case limits the doctrine even further, a course most courts have recently followed. *See* 1B ELLEN M. FLYNN ET AL., BENEDICT ON ADMIRALTY § 25, at 3-114 n.28 (7th ed. 1993) and cases cited. The *Bernard* court clearly stated the limiting principles of the primary duty rule:

> From these cases, three limiting principles can be discerned. First the "primary duty" rule will not bar a claim of injury arising from the breach of a duty that the plaintiff did not consciously assume as a term of his employment. Second, the rule does not apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated. Third, the rule applies only to a knowing

> violation of a duty consciously assumed as a term of employment.

*Bernard*, 22 F.2d at 907. The argument that Clifton violated the primary duty rule fails under each of these limiting doctrines.

First, defendants presented no evidence that Clifton consciously assumed the duty of maintaining and repairing the propeller. All available evidence is directly to the contrary. Second, Clifton neither created the dangerous condition, nor could he have controlled or eliminated it in the exercise of his employment duties. Third, Clifton did not knowingly violate a consciously assumed duty. From the evidence presented at trial, any violation of a duty resulting in the entanglement of the net in the propeller fell on the captain's shoulders, not Clifton's.

This theory offers defendants absolutely no respite.

## 2. Assumption of Risk

 Defendants spend a great deal of their brief informing the court of "certain inevitable hazards" of being a fisherman, which are to be borne solely by the fisherman. *See, e.g.*, Def.'s Trial Br. at 6. The most we can make of this argument is that defendants apparently believe they have an assumption of risk defense. It is well settled, however, that assumption of risk is not a defense to either an unseaworthiness claim or a Jones Act claim. *See* 2 NORRIS, SEAMEN §§ 27:12, 30:33. We see no need to further elaborate on this settled rule.

## 3. "Warranty Of Being Fit For The Voyage And Of Being Of Normal Agility And Coordination"

Defendants next assert that "[p]laintiff breached the warranty owed by a seaman that he was fit to work aboard the [vessel] on the particular voyage in question and that he had the normal agility and coordination of a seaman to do the ship's work." Def.'s Trial Br. at 7. In making this argument, defendants have manufactured law in their favor.[5]

Defendants cite *Gibson v. International Freighting Corp.* for the proposition that "[a] seaman owes a warranty . . . that he is fit for work

---

[5] While we are fully supportive of good faith arguments to extend a principle of law, this is not what we have before us. Defendants' counsel cites cases as if they stand for propositions which they do not, and argues his point as if there were settled doctrine in his favor. We see nothing in the cases which supports his arguments. Counsel's avoidable misrepresentations border on sanctionable conduct.

upon a vessel." Def.'s Trial Br. at 7. Defense counsel, however, cites us to no portion of the case which stands for this proposition. Having carefully read the case numerous times, we can find none. Nor do we know of any other case which stands for this proposition.

Defendants also appear to be under a mistaken assumption that Clifton's failure to obtain a "fit for duty" card prior to joining the vessel bars his recovery. Again, defendants cite no authority for this proposition. On the other hand, the U.S. Supreme Court and numerous federal circuit courts have clearly stated that even active fraud in gaining employment by concealing an injury or illness will not bar recovery to a person in Clifton's position. *See Still v. Norfolk & Western Rwy. Co.*, 368 U.S. 35 (1961) (FELA); *see also Compton v. Luckenbach Overseas Corp.*, 425 F.2d 1130, 1133 (2d Cir.), cert. denied, 400 U.S. 916 (1970) (applying *Still* to Jones Act and unseaworthiness claims); *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 530 (9th Cir.1962) (same); *Rapitis v. Sea-Land Corp.*, 921 F.2d 281 (9th Cir. 1991) (same); 2 NORRIS, SEAMEN § 30:6.

Thus, defendants' contentions regarding Clifton's health upon joining the vessel and his lack of a "fit for duty" card have no merit.

### 4. Preexisting Condition or Injury

Defendants have also contended that Clifton had a preexisting condition which made him more susceptible to the development of CTS, and that they are, therefore, not liable for his injuries. This argument fails for two reasons. First, defendants have not proved as a factual matter that Clifton had a preexisting condition making him more susceptible to developing CTS.

Second, even if they had, every first-year law student knows that when a defendant's wrongful act causes a plaintiff to suffer injury, the defendant is fully liable for the injury, even though the plaintiff had a preexisting condition making him more susceptible to injury or making his injury more severe. *See, e.g., Jordan v. Atchison, Topeka & Santa Fe Ry. Co.*, 934 F.2d 225, 229 (9th Cir. 1991); *Maurer v. United States*, 668 F.2d 98, 99-100 (2d Cir. 1981). In other words, a defendant takes the plaintiff as he finds him. *Maurer, Id.* at 99-100. This doctrine has been applied to cases under FELA, *see Jordan*, 934 F.2d at 228-29, and the Longshoremen's and Harbor Worker's Compensation Act, 33 U.S.C. §§ 901 *et seq., see SAIF Corp./Oregon Ship v. Johnson*, 908 F.2d 1434, 1441 (9th Cir. 1990). It is also, therefore, applicable to a Jones Act claim.

Because seaworthiness is a no-fault obligation placed upon a ship's owner, we see no reason why a plaintiff's preexisting condition would excuse the shipowner from that obligation. The fact that Clifton may have had a preexisting condition making him more susceptible to injury in no way changes the fact that the ship was unseaworthy or that the unseaworthy condition proximately caused his injury. Thus, defendants have no defense to either the unseaworthiness or Jones Act claims based upon an alleged preexisting condition making Clifton more susceptible to injury.

## D. Damages Under the Jones Act and Unseaworthiness Claims

Clifton has succeeded in proving both his Jones Act and unseaworthiness claims. The two claims overlap, however, and Clifton can only recover once under the two claims. Previously, a plaintiff could recover more broadly under the general maritime law of unseaworthiness than he could under the Jones Act. However, in *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), the Supreme Court held that recovery under the two should be uniform, and has deferred to the statutory standards for recovery under both.

Clifton has requested the following damages under his Jones Act and unseaworthiness claims: "Past, present, and future pain and suffering, disability, and loss of future earning capacity of at least $1,500,000."[6] Pl.'s Trial Mem. at 8. He has also requested past medical expenses, unpaid maintenance, legal expenses and punitive damages under maintenance and cure, which we deal with below.

Clifton worked in the fishing industry for many years, and claims that he had planned to make it his career, working from fisherman, to assistant engineer, to engineer, and beyond. He was 26 years old at the time of his injury. He had approximately 39 years until his retirement. Even if Clifton had never been promoted above fisherman, he stood to make nearly $1,000,000 over the course of his career.

We have had great difficulty working with the numbers presented us. Clifton has not broken down his damage request into its various components. Neither party has presented much evidence about what Clifton's opportunities and time-frame for promotion would have been.

---

[6] We note the imprecision with which Clifton's counsel has pled damages. Counsel gives us no guidance on the breakdown of the $1,500,000 minimum claim between lost present and future wages, disability, or pain and suffering. However, we believe that we have made appropriate awards for each below.

94

Defendants, though informing us that Clifton is working again, have provided us with no information regarding his current wage for us to offset against his lost future wages from the fishing industry. Nevertheless, we have made findings and determinations with regard to all of Clifton's claims.

## 1. Lost Future Wages

 Neither party has briefed the court on the specific issue of loss of future wages, yet we must resolve it. Lost future wages, also called impaired earning capacity, are determined by considering "what the plaintiff's income would probably have been, how long it would have lasted, and all the contingencies to which it was liable." 22 AM. JUR. 2D *Damages* § 157 (1988). To ascertain the amount to be awarded, we must take four steps: (1) determine whether Clifton's earning capacity has been diminished; (2) determine the duration of the loss; (3) determine the value of Clifton's loss over this period; (4) consider reducing the award to present value. *Id.*

### a. Diminution of earning capacity

Clifton has clearly suffered a diminution in earning capacity. We must turn to the second and third inquiries to determine the extent of that diminution. We have included findings for each.

### b. Duration of Loss

Clifton planned on making his career working on fishing vessels. Based upon a retirement age of 65 years, Clifton had a 39-year work-life expectancy at the time of his injury. Clifton's injuries are permanent, and will permanently prevent him from plying his trade as a fisherman. Thus, Clifton's total lost earning capacity must be determined over the entirety of the 39-year period.

### c. Value of Loss

Clifton would have fished on ships with average annual catches of 5,000 tons of fish.[7] He would have continued to make $4 per ton as a deckhand and oiler. With extensive engine room experience and prior experience

---

[7] Clifton has informed us that on average 10 fishing trips would be made per year with an average catch of 500 tons per trip. Defendants tells us that 4-5 trips would be made each year, with an average catch of 1,100-1,200 tons. Each of these estimates provides us with an annual catch of around 5,000 tons per year.

as an assistant engineer, we believe Clifton would have found permanent employment as an assistant engineer within 10 years. In that position, he would have made approximately $11 per ton.[8]

Although Clifton's goal was to become a chief engineer, he has presented little evidence on his chances of attaining this position. In order to find that Clifton would have achieved this position, we need adequate information about how many assistant engineers get promoted to chief engineer, the time frame for such promotion, and Clifton's abilities with regard to such a position. Clifton has not offered adequate information in these areas to carry his burden. Thus, we find that Clifton would have remained an assistant engineer until retirement.

Calculating total earnings from these numbers, we achieve the following:
 Fisherman: $4/ton x 5,000 tons/year x 10 years = $200,000
 Assistant Engineer: $11/ton x 5,000 tons/year x 29 years = $1,595,000
Thus, at the time of Clifton's injury, his total expected future wages were $1,795,000.

This amount is not Clifton's diminished earning capacity, however. To determine that, we must compare what Clifton was capable of earning at the time of the injury with what he is capable of earning after it occurred. 22 AM. JUR. 2D *Damages* § 167. Defendants, however, have provided no evidence of what Clifton is capable of earning or what he is currently earning in his position at Safety Systems.[9]

In 1992, the year after Clifton suffered his injury, people working in the shipping industry earned higher wages than all other employment sectors, except a few "skilled" sectors.[10] *See American Samoa Statistical Digest,*

---

[8] Clifton informs us that an assistant engineer makes from $9-$11 per ton. Defendants inform us that an assistant engineer makes from $10-$14 per ton. Although $11 is at the high end of Clifton's range, it is at the low end of defendants' range.

[9] Because defendants have the burden on this issue, we are reticent to offset Clifton's expected earnings after the accident against his expected earnings before the accident at all. However, to ignore such an issue would grossly overcompensate Clifton, and so we must undertake the analysis. However, we shall do so by giving strong favor to Clifton's claims.

[10] We call these "skilled" sectors because they generally require either advanced education or special skills of some sort. They include finance and insurance, petroleum marketing, printing and publishing, private hospitals and educational institutions, and ship maintenance.

96

*1992*, at 142 (1992 Economic Development Planning Office). In 1992, the average hourly income for shipping was $4.22. *Id.* The average income for other "nonskilled" sectors was $3.44. *Id.* In other words, those working in the shipping industry were making almost 20% more than those working in other unskilled sectors.

Clifton's earning capacity has been diminished not only by his forced change in employment sector, but also by the injuries which limit the positions he can assume in each sector. For instance, after the shipping industry, the highest paid sector is construction. *See Id.* Clifton, however, would be unable to take a position in construction due to the disability in his wrists and hands. Thus, we find that Clifton's earning capacity has been reduced an additional 25% due to his ongoing disability.[11]

This gives us a total reduction in earning capacity of 45%. Multiplying this factor by Clifton's expected future wages of $1,795,000 gives a diminished earning capacity of $807,750. We award this amount to Clifton.

### d. Accord with Other Cases

The award given above is comparable to awards given in similar cases. In *Milos v. Sea-Land Serv., Inc.*, 478 F. Supp. 1019 (S.D.N.Y. 1979), a seaman with a 14-year career-life was awarded $360,000 after developing CTS. Similarly, in *Fanoli v. Sealand Servs., Inc.*, Case No. L-02810-81 (N.J. Super. 1990), a 65-year old seaman was awarded $1,300,000 for injuries which developed into CTS.

Taking into account the relative career-lives of Clifton and the plaintiffs in those cases, as well as the nature of their injuries, our award is consistent with those in other jurisdictions.

### e. Reduction to Present Worth

The parties have failed to brief us on the issue of whether Clifton's award for impairment of earning capacity should be reduced to present value. Thus, we are left, once again, to our own devices. We quickly review what the relative positions of other courts on the issue have been.

---

[11] The 25% figure is based partly on the nature of the work and the average salaries in the job sectors into which Clifton might move. It is also based partly upon the amount of disability Clifton has received, which medical experts have placed at 25% in each hand and 23% in each arm.

The amount of money awarded a plaintiff for loss of future earning capacity is a lump-sum payment to compensate him for money he would have received over the course of his working years. Offering a plaintiff the full value of this award at the time of judgment overcompensates the plaintiff by ignoring the fact that money itself has an earning capacity. *See* AM. JUR. 2D *Damages* § 174. For this reason, numerous jurisdictions have adopted the practice of reducing impairment of earning capacity awards to present value. *Id.* § 174.

Other courts, however, have chosen to adopt a "total offset" regarding present value. *Id.* § 145; *see also Barnes v. United States*, 685 F.2d 66 (3d Cir. 1982) (applying Pennsylvania law); *Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij*, 443 F.2d 76 (2d Cir. 1971) (applying New York law), *cert. denied* 411 U.S. 933 (1973); *State v. Guinn*, 555 P.2d 530 (Alaska 1976); *Paducah Area Public Library v. Terry*, 655 S.W.2d 19 (Ky. 1983). Under this theory, the earning power of the money is offset against (eliminated by) inflation and the reduced purchasing power of money over time. Thus, reducing the award to present value undercompensates a plaintiff.

We know of only one case in this court in which discounting to present value was discussed. In *Fa'avae v. American Samoa Power Auth.*, 5 A.S.R.2d 53 (1987), this court assumed an interest rate and inflation rate in determining the discounted present value of a torts award. *See Id.* at 57. The court, however, seemed very dissatisfied with this conclusion, and explicitly invited the parties to move for reconsideration or new trial based upon its ambivalence. *See id.* Today, we do not feel even the meager confidence that the court felt in making that ruling.

▮ Normally, we must consider a good deal of evidence about interest rates, rates of inflation, proper investments, etc. in reducing an award. Defendants have the burden of production and proof on this issue. While we could take judicial notice of such things *sua sponte*, we feel this would be not only unwise and possibly unfair to Clifton, but would also allow defense attorneys to shirk their responsibility in presenting appropriate facts and arguments to this court. The wiser course is to hold that, where defense counsel has neither asked for reduction nor presented the relevant facts for such a reduction, we will not reduce an award to present value.

This should not be read to imply that we will not reduce an award upon proper presentation of the issue by a defendant. In fact, we may be bound to do so by the precedent in *Fa'avae*. This should also not be read as an invitation to defense counsel in this case to move for reconsideration or new trial, as we extended in *Fa'avae*. As far as we are

concerned, defendants have failed in carrying the burden on this issue and will not be given "a second bite at the apple." Thus, Clifton is entitled to the full $807,750 for lost future wages.

## 2. Pain and Suffering

Clifton has suffered significant pain and suffering arising from his injuries. Before his carpal tunnel release surgery, the pain was so great that he could not sleep at night. Following the surgery, he was able to sleep, but still suffered pain and numbness in his wrists and hands at the time of trial, some four years later. Of course, as defendants have urged upon us repeatedly, Clifton is not so impaired as to prevent him from embarking on endeavors such as walking on his hands at a New Year's Eve party.

We find that Clifton's pain is real, substantial and ongoing. However, the pain apparently has not affected him to the same extent as the disability and loss of future earning capacity. For these reasons, we award Clifton $50,000 for pain and suffering.

## 3. Disability

Clifton seeks a separate award for his disability. However, we feel we have already taken Clifton's disability into account in awarding impaired earning capacity. Clifton has presented no evidence that his disability has caused him damage, compensatory or otherwise, beyond his loss of earning capacity. Therefore, no separate award will be given, having already been included above.

## 4. Interest

Pre-judgment interest is not allowed on either Jones Act or unseaworthiness claims. *Cleveland Tankers, Inc. v. Tierney*, 169 F.2d 622 (6th Cir. 1948); *see also* 2 NORRIS, SEAMEN § 30:43. Post-judgment interest under the Jones Act is allowed from the date of a court's final decree. *Cleveland Tankers, supra* at 626; *see also* 2 NORRIS, SEAMEN § 30:43. Interest may also be awarded in general maritime cases at the court's discretion. *Sabine Towing Co. v. Brennan*, 85 F.2d 478 (5th Cir. 1936); *see also* 2 NORRIS, SEAMEN § 30:43. We find this to be an appropriate case for the award of post-judgment interest, which we set at 6%.

## E. Maintenance and Cure

## 1. Maintenance and Cure Owed

■ A shipowner has an ancient obligation to care for a seaman injured during the course of maritime employment. *See Vaughan v. Atkinson,* 369 U.S. 527, 531-32 (1962). The obligation continues to exist under general maritime law. The obligation includes payment for any injury or illness which manifests itself during employment, regardless of the source of the injury or whether it preexisted the journey.

■ To be eligible, a seaman must be "in the service of his ship" at the time of the injury. *See Aguilar v. Standard Oil Co. of New Jersey,* 318 U.S. 724 (1943). As discussed above, the medical experts have drawn a causal connection between Clifton's effort in freeing the vessel from its net and his development of CTS. Thus, Clifton's injuries arose while he was acting in the service of the vessel.

■ Under maintenance and cure a seaman is entitled to receive food and lodging of a kind and quality received aboard ship, as well as necessary medical services to the point of maximum cure. The point of maximum cure is reached on the date that a seaman's physician determines that further treatment is unlikely to result in the betterment of the seaman's condition. *Gilliken v. United States,* 764 F. Supp. 261, 269 (E.D.N.Y. 1991). This can include a determination that the incapacity is permanent. *Id.* Doubts are to be resolved in the seaman's favor. *Breese v. AWI, Inc.,* 823 F.2d 100 (5th Cir. 1987).

The parties apparently agree that $12 per day is the appropriate rate for Clifton's maintenance. We adopt this amount. The exhibits show that the owner paid Clifton maintenance for 90 days, but has not paid any of his medical bills.

Clifton left the vessel when it docked on September 4, 1991. He became entitled to collect maintenance beginning on that day. He sought medical attention the next day and underwent surgery on September 12 and 26, 1991. Clifton has presented almost no evidence of medical treatment after this date. At one point in an exhibit, it is noted that he continued visiting the doctor until April 1992.

Clifton offered no evidence that he continued to receive physical therapy or other medical treatment following that date. The only medical "treatment" he has shown at all after April 1992 is two trips to the Straub Clinic and one to Dr. Tuato'o. However, all of these trips appear from Clifton's exhibits and testimony to have been diagnostic in nature not rehabilitative. In fact, the visits seem to have been more helpful to Clifton in preparing for trial than in treating his condition. We will not award Clifton maintenance and cure for these visits.

The Straub documents do not indicate that any improvement in Clifton's condition is expected. As we stated above, we believe that Clifton has suffered a permanent disability. As he has not found it necessary to seek regular physical therapy over the past four years, we must assume that he agrees with us. Thus, we hold that Clifton reached maximum cure on or about April 2, 1992.[12] The maintenance payments made by defendants would cover the period from September 4, 1991 to December 2, 1991. Thus, defendants still owe maintenance and cure from December 2, 1991, to April 2, 1992, a total of 124 days. At $12 per day, unpaid maintenance comes to $1,464.

## 2. Interest

■ The court has discretion whether to award interest on unpaid maintenance and cure. *See* 2 NORRIS, SEAMEN § 26:71. Interest has been awarded from the time payment was due, *Great Lakes S.S. Co. v. Geiger*, 261 F. 275 (6th Cir. 1919), from the date of filing, *Perez v. Suwanee S.S. Co.*, 239 F.2d 180 (2d Cir. 1956), and from the date of decree, *Hazelton v. Luckenbach S.S. Co.*, 134 F. Supp. 525 (D. Mass. 1955). The preferred method seems to be the awarding of interest from the date payment was due. 2 NORRIS, SEAMEN at 182 n.71.

■ In a case of unpaid maintenance and cure, the defendant will have enjoyed the benefit of money properly belonging to the plaintiff. As a court, we must particularly protect the right of injured seamen who are like wards before us. *Cf.* 2 NORRIS, SEAMEN § 26:71. Thus, we hold that in a normal case[13] of unpaid maintenance and cure, pre-judgment interest is payable from the date the payment was initially due the plaintiff.

We will determine interest by calculating 6% simple interest on the unpaid balance of maintenance and cure beginning January 2, 1992.[14]

---

[12] Because we do not have an exact date when Clifton stopped seeing the doctor, we have chosen April 2, 1992. This date is near the beginning of the month, and probably does not overaward Clifton. It is convenient because it makes the total unpaid maintenance period exactly four months. It also makes the calculation of interest simpler, *see infra.*

[13] We do not address the issue of what exceptional factual circumstances might be presented by defendants to relieve them of the duty to pay interest. Defendants made no attempt to show such exceptional circumstances in this case.

[14] We begin calculating interest on January 2, 1992, because this appears to be a close approximation of when the payment would have been due Clifton. Although the owner normally paid in 30-day increments, we

Thus, it is easier to figure the *period* monthly (1/12) than in 30-day increments (30/365 or 30/366). The difference in the ultimate results is minuscule and does not compound since we are figuring only simple interest. The interest due on the unpaid principle from that date until November 28, 1995 is $331.99. This amount will be added to the unpaid maintenance and cure already awarded for a total maintenance and cure judgment of $1,795.99.

Post-judgment interest is also available on a maintenance and cure award. We will award 6% post-judgment interest on the entire maintenance and cure award above, including pre-judgment interest.[15]

## F. Attorney's Fees and Costs

Clifton has also brought a claim for attorney's fees and costs for this action. The granting of costs is within the discretion of the admiralty court, and wide discretion is often exercised. 2 Norris, *Seamen* § 30:43. We feel that an award of costs beyond filing and service fees in this case is appropriate. Such an award should include Clifton's visits to the Straub Clinic and Dr. Tuato`o, which we excluded under maintenance and cure. Plaintiff's exhibits establish this amount as $2,330.39. We award this amount plus court costs to Clifton.

We have found no case awarding attorney's fees under either the Jones Act or the general maritime claim of unseaworthiness. Attorney's fees have, however, been allowed for a bad-faith refusal to pay maintenance and cure. *See, e.g.*, *Vaughan v. Atkinson*, 369 U.S. 527 (1962); *Kopczynski v. The Jacqueline*, 742 F.2d 555, 559 (9th Cir. 1984). Clifton has not convinced us that the owner's failure to pay maintenance and cure was in bad faith. As we stated above, he has presented us with almost no evidence of medical treatment after his surgery in 1991. We also have no idea what information he gave to or claims he made of the owner. We simply cannot rule that the owner acted in bad faith.

Thus, Clifton's claim for attorney's fees is denied.

---

have a substantially easier time calculating interest by assuming that payments were due monthly. The formula we have used is: *unpaid balance* x 6% x *period* .

[15] We award post-judgment interest on the pre-judgment interest as well as the principle maintenance and cure owed for two reasons. First, because this amount has now been rightfully adjudged as damages owed by the defendant to the plaintiff. Second, it is both more logical and mathematically simpler to award interest on the entire judgment.

## G. Punitive Damages

Clifton has also claimed punitive damages for bad faith failure to pay maintenance and cure. He is not entitled to punitive damages since, as we stated above, we do not believe defendants acted in bad faith.

In arguing for punitive damages, Clifton relied primarily upon *Kopczynski v. The Jacqueline*, 742 F.2d 555 (9th Cir. 1984). Since the trial of this case, however, the Ninth Circuit has explicitly limited the scope of *Kopczynski* to not allow for punitive damages. *See Glynn v. Roy Al Boat Management Corp.*, 57 F.3d 1495 (9th Cir. 1995). Almost every court to consider the issue thus far has agreed with the Ninth Circuit. *See id.* Having decided the factual issue against Clifton, we need not consider the legal issue at this time, but it would be difficult for us to go against the rising tide of federal courts holding that punitive damages will not attach to a maintenance and cure claim.

Clifton's request for punitive damages is denied.

## H. Liability of Defendants

Clifton has requested joint and several liability amongst the defendants. However, he has not made out claims against all of the defendants. We must determine who is liable to pay Clifton's damages.

### 1. The Owner and Employer--Voyager, Inc.

 A claim of unseaworthiness lies against a vessel's owner. A Jones Act negligence claim, on the other hand, lies against a seaman's employer. By incorporating the provisions of FELA into the Jones Act, Congress made the employer liable for the negligence of its "officers, agents, or employees." *See* 45 U.S.C.S. § 51 (West 1981 & Supp. 1994); *see also* 2 NORRIS, SEAMEN § 30:6 ("The shipowner is vicariously liable [under the Jones Act] for the negligence of the master which results in injury to the seaman . . . ."). Thus, Clifton's employer is liable for the negligence of the vessel's captain and any other employee. The vessel's owner in this case is Voyager, Inc. Clifton's employer is also, presumably, Voyager, Inc.[16] Thus, the liability for both the unseaworthiness and Jones Act claims lies against Voyager, Inc.

Maintenance and cure also lies against a ship's owner. Thus, Voyager, Inc. is also liable for the maintenance and cure judgment.

---

[16] Clifton can move this court to modify its order if it has information showing that Clifton's employer was other than Voyager, Inc.

103

## 2. The Vessel--*M/V Voyager*

■ As near as we can tell, the only action lying against a vessel *in rem* is that for maintenance and cure. A Jones Act case cannot be maintained *in rem*. *Plamals v. S.S. Pinar Del Rio*, 277 U.S. 151 (1928), *overruled on other grounds*, *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944); *see also* 2 NORRIS, SEAMEN § 30:25. With the scope of general maritime damages being limited to that of the Jones Act, an *in rem* action presumably cannot be brought for unseaworthiness either.

## 3. The Captain--Captain Frank Gargas

As Clifton has pled and tried his case, no liability will lie against the captain. A Jones Act negligence recovery does not preclude an injured seaman from bringing an action against a third party whom he alleges to have negligently caused his injury. *Schaeffer v. Michigan-Ohio Navigation Co.*, 416 F.2d 217, 221 (6th Cir. 1969); *see* 2 NORRIS, SEAMEN §§ 30:6, 30:34; *cf. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124 (1955) (recovery for injury under the Longshoremen's and Harbor Worker's Compensation Act, 33 U.S.C.S. §§ 901 *et seq.*, does not bar recovery against a third party alleged to have caused plaintiff's injury); *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946) (same).

However, Clifton has not brought a separate negligence claim against the captain. The two-year statute of limitations for such an action, *see* A.S.C.A. § 43.0120, has long since passed. Neither unseaworthiness, Jones Act negligence, nor a claim for maintenance and cure lies against a ship's employee, even the ship's captain. Thus, Clifton cannot directly recover against the captain.

Although the captain and his wife are the sole shareholders in the owner, Clifton has made no effort to pierce the corporate veil. Thus, the captain cannot be held liable as a shareholder in the owner. Therefore, there is no grounds for holding the captain liable for any of the awards.

## 4. Costs

Because the owner and the vessel are the only defendants liable for Clifton's damages, they shall also be solely liable for the award of costs.

## III. Conclusion

In conclusion, we award Clifton $807,750 for his lost earning capacity and for his disability. We award him an additional $50,000 for pain and suffering. We also hold that he is entitled to 122 days of unpaid

maintenance and cure plus 6% interest in a total amount of $1,795.99. We further award costs in the amount of $2,330.39 plus court costs. Clifton is not entitled to attorney's fees.

Therefore, a total judgment of $861,876.38 plus court costs shall enter for Clifton, with 6% interest to accrue from today.

It is so ordered.

